**William M. McCORMICK,**
**Plaintiff–Appellant,**

v.

**The FUND AMERICAN COMPANIES,**
**INC., a Delaware corporation,**
**Defendant–Appellee.**

**No. 92–16750.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 10, 1994.

Decided May 20, 1994.

John Van Der Tuin (argued), J. Robert Horton, Stults & Balber, P.C., New York City, and Marc B. Scott, Law Offices of Mark B. Scott, Sausalito, CA, on the brief, for plaintiff-appellant.

Philip P. Berelson, Brown & Bain, Palo Alto, CA, for defendant-appellee.

Before: FLETCHER, KOZINSKI and TROTT, Circuit Judges.

Opinion by Judge FLETCHER.

FLETCHER, Circuit Judge:

Plaintiff William M. McCormick appeals the dismissal of his claims on summary judgment. Between 1983 and 1989, McCormick was CEO of the Fireman's Fund Insurance Company (FFIC), a wholly-owned subsidiary of defendant Fund American Companies (FAC). When McCormick resigned from FFIC, he owned approximately 500,000 performance shares and option shares in FAC. The vesting period for these securities ran through the end of 1991. McCormick sold all of his securities back to FAC in May 1990. At that time, FAC was involved in negotiations for the sale of FFIC to a large foreign insurer. Those discussions were ultimately fruitful, and as a result of the sale of FFIC, the market value of FAC shares nearly doubled.

Before the buyout of McCormick's securities was completed, company officials told McCormick about the pending discussions with the foreign insurer, and about the likely increase in the value of FAC stock if the sale were made. After the sale, McCormick claimed that the officials had misrepresented

or omitted many material facts. He brought suit against FAC under § 10(b) of the Securities Exchange Act of 1934, and also alleged various related state statutory and common-law claims. The district court granted summary judgment in favor of FAC on all claims. We affirm.

## FACTS

### 1. *FAC's initial discussion with investment banker*

On January 4, 1990, John J. Byrne, CEO and chairman of the board of FAC, and Robert Marto, FAC's executive vice president and chief financial officer, met in New York with Robert Lusardi, a senior vice president at Lehman Brothers, investment bankers for FFIC. The three men discussed a possible sale of a minority interest in FFIC. Lusardi told the FAC executives that he thought the sale of a minority interest was not a good idea. McCormick contends that Lusardi also told Byrne and Marto that the best strategy would be to sell FFIC outright, but Marto denied in his deposition that Lusardi had made such a statement, and nothing in the testimony cited by McCormick indicates otherwise.

The parties disagree about whether, later in January 1990, Lusardi was retained to find a buyer for FFIC. Byrne and Marto both denied in their depositions that any retainer arrangement was entered into until July 1990. McCormick, however, cites to FAC's November 1990 proxy statement, in which it is stated that "FAC engaged Lehman Brothers as of January 15, 1990, to act as FAC's agent for the purpose of identifying opportunities for the sale of FAC and/or FFIC and its subsidiaries." Proxy Statement at 23.

### 2. *Lusardi's February meeting and subsequent activity*

On February 8, 1990, Lusardi went to Germany and met with representatives of Allianz, a large German insurance company, to inquire whether Allianz was interested in purchasing either a minority stake in FFIC or the whole company. Lusardi testified that he had not been "authorized per se" to do this, but that it is in the nature of investment banking to test the waters without such specific authorization. Lusardi also testified that he had missed a similar opportunity for FAC on an earlier occasion, and that he was anxious not to repeat his mistake.

On February 21, 1990, Lusardi wrote a letter to Alexander Hoyos of Allianz, stating in pertinent part that

> To demonstrate that the transaction [discussed on February 8] would indeed be contemplated by the company, and that we were "authorized" to discuss it, the company's senior management has agreed to be available for a preliminary meeting at our offices in New York. Depending on whom Allianz sends to the meeting, the Chief Financial Officer and/or the Chairman and Chief Executive Officer would attend. Their schedules are such that they are available to meet during March 13 to 16th.

Lusardi testified that he had learned that the FAC executives would be available on those days through a conversation with Marto. No meeting took place in March. Apparently, Lusardi continued to provide Allianz with information about FFIC through April of 1990.

### 3. *May 4 meeting between Allianz and FAC and subsequent events*

On April 26, 1990, Lusardi scheduled a meeting for May 4 between Allianz representatives and Marto and Jay Brown, president and CEO of FFIC. At some point before Marto and Brown attended the meeting, which was held at Allianz's offices in Munich, they asked Byrne for permission to attend. It is unclear when this occurred. Brown remembered Byrne asking him in March when it would be convenient for him, Brown, to meet with Allianz. Byrne, however, said that the conversation took place "on or about May 1." Byrne also testified that at the time he believed that all Allianz was interested in buying was a 20% share in FFIC.

At the May 4 meeting, Brown gave an overview of FFIC and its insurance business; Marto talked about FAC's other assets. Marto also discussed various ways in which to structure a possible sale: Allianz might buy either FAC or FFIC; if FFIC were purchased, FAC would be willing to reinsure

up to half of FFIC's reserves, and/or to buy back any non-insurance assets at book value. Marto also mentioned a firm selling price—$3.4 or $3.5 billion.

Brown testified that he was unable to determine whether or not Allianz had any interest at all in the transaction. Byrne testified that both Brown and Marto reported back to him that the Allianz representatives had sat poker-faced during FAC's presentation. Subsequently, after Allianz had expressed an interest in further negotiations, Brown told Lusardi that the Allianz representatives showed more respect for FFIC at the May 4 meeting than they had shown five years earlier, when they had offered a very low bid. Brown also told Lusardi that the meeting had gone "fairly well."

On May 9, Marto sent Allianz confidential information, along with a confidentiality agreement which Allianz was to execute. Marto had previously disclosed some nonpublic information at the May 4 meeting. Also on May 9, Marto wrote a letter to Allianz confirming that FAC was willing to buy back at book value any of FFIC's non-insurance assets, and to reinsure up to 50% of FFIC's reserves. On May 14, Lusardi told Byrne and Marto that Allianz was interested in further discussions in early June. Around this time, Byrne began to realize that "more had been going on than [he] had realized," and he planned to get to the bottom of it with Marto and Lusardi after finishing his work for the shareholders' and directors' meeting scheduled for May 16.

### 4. *The buyout of McCormick's securities*

On April 27, Byrne proposed to McCormick that FAC repurchase his securities for $6 million. On May 14, Byrne raised the offer to $8 million; this amounted to a per-share price of $38 at a time when the shares were trading for $31 per share.[1] Byrne stated that this was the last offer FAC would make to McCormick that year. McCormick signed a buyout agreement and release on May 15 so that Byrne could present it for approval at the directors' meeting scheduled for May 16. At the time he signed the

agreement, McCormick had been told nothing about FAC's discussions with Allianz.

On the morning of May 16, however, Byrne was approached by George Gillespie, a member of FAC's board of directors and a partner at the law firm of Cravath, Swain & Moore, general counsel for FAC. Gillespie had learned about the Allianz developments from another Cravath partner, who had drafted the May 9 confidentiality agreement at Marto's request. Gillespie told Byrne that he was very concerned about allowing McCormick to go through with the buyout without first being told about the Allianz developments. Byrne agreed that disclosure should be made, and told Marto to brief McCormick on the Allianz discussions.

That briefing was memorialized in the following acknowledgment, dated May 16, 1990 and signed by McCormick and Marto (the Acknowledgment):

> On this date, while the Human Resources Committee of the Board of Directors of Fund American was meeting, among other things to consider the proposed buy-out of William McCormick's employment contract interests, including his almost 500,000 shares of Fund American stock, in various forms, Mr. McCormick and Robert Marto met. Mr. Marto advised Mr. McCormick that preliminary discussions were about to commence with a possible foreign buyer of Fireman's Fund Insurance Company (FFIC) and that a confidentiality letter had been sent to such possible foreign buyer. If a transaction were to eventuate, after presumably extensive due diligence, the price might well exceed $50 per Fund American share—a price well above the approximately $38 per Fund American share/option called for by Mr. McCormick's buy-out proposal before the Human Resources Committee. The Committee is concerned that Mr. McCormick understand the foregoing and, if the buyout goes forward in the terms discussed, that Mr. McCormick acknowledge that he has been fully and adequately informed of the foregoing facts and circumstances.

1. The $8 million figure also included $1.3 million for McCormick's nonstock benefits.

McCormick's briefing was largely confined to the items specified in the Acknowledgment. McCormick asked Marto for the name of the foreign buyer, but was told that this was confidential. McCormick also asked Byrne about the transaction. In particular, McCormick asked Byrne if he had known about the possible sale when he first approached McCormick with the buyout proposal on April 27. Byrne said that he did not. Byrne did tell McCormick that as of May 16, there had been a preliminary meeting with the potential buyer. The parties then went through with the buyout of McCormick's shares.[2]

### 5. Post-buyout events

Two days after the buyout, FAC and Allianz scheduled a meeting for early June 1990; in June, Allianz representatives came to San Francisco for several days of discussions with FAC representatives. As late as mid-July 1990, however, both Byrne and Lusardi were doubtful that the sale would go through, since the parties disagreed about price. But on August 1, 1990, Allianz and FAC agreed that Allianz would buy FFIC for $3.315 billion. FAC agreed to buy back the non-insurance assets. The price of FAC stock eventually rose to about $50 per share.

### 6. Litigation

After McCormick had been successful in getting FAC to invest in his new insurance venture, PennCorp, he demanded an additional $5 million in connection with the May 16 buyout. When FAC refused, McCormick sued, alleging violation of federal and state securities laws, common law breach of fiduciary duty, fraud, negligent misrepresentation, and rescission. At the heart of all of the claims are eight alleged omissions and seven alleged misrepresentations in the Acknowledgment and the briefing which accompanied it.

## DISCUSSION

■■■ We review the district court's summary judgment ruling de novo. *In re Apple*

Computer Secs. Litig., 886 F.2d 1109, 1112 (9th Cir.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Id.* Although materiality, the dispositive issue here, is a "fact-specific issue[ ]" which should ordinarily be left to the trier of fact," summary judgment may nevertheless be justified "in appropriate cases." *Id.* at 1113. Summary judgment is only appropriate if no rational finder of fact could find that the alleged misrepresentations and omissions were material. *Id.* at 1115.

### I

### *Violation of Federal Securities Laws*

■■■ To make out a claim under § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, plaintiff must show that there has been a misstatement or omission of material fact, made with scienter, which proximately caused his or her injury. *McGonigle v. Combs*, 968 F.2d 810, 817 (9th Cir.), cert. dismissed, —— U.S. ——, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992). In addition, the misstatement or omission complained of must be misleading; in the case of an omission, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988).

### A. Duty to Disclose

■■ FAC's conduct on May 16, 1990 indicated that at that time it recognized a duty either to disclose to McCormick material nonpublic information relating to the transaction it was about to engage in with him, or to refrain from repurchasing his securities. FAC's brief, however, together with counsel's comments at oral argument, suggests that in the course of litigation FAC has distanced itself from that position.

---

**2.** Counsel for McCormick conceded at oral argument that while McCormick may technically have been bound to go through with the buyout on the basis of the agreement he signed on May 15, 1990, the parties' understanding at the time was that he could have backed out of the bargain after the May 16 disclosure.

The original position was the correct one. Numerous authorities have held or otherwise stated that the corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them. *Smith v. Duff & Phelps, Inc.,* 891 F.2d 1567, 1572–75 (11th Cir.1990) (duty to disclose merger negotiations to an employee who departs voluntarily and cashes in his shares as a condition of termination); *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 435–39 (7th Cir.1987) (same), *cert. dismissed,* 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988); *Kohler v. Kohler Co.,* 319 F.2d 634, 638 (7th Cir.1963) ("underlying principles [mandating disclosure of material nonpublic information] apply not only to majority stockholders of corporations and corporate insiders, but equally to corporations themselves"); *Green v. Hamilton Internat'l Corp.,* 437 F.Supp. 723, 728 (S.D.N.Y.1977) ("there can be no doubt that the prohibition against 'insider' trading extends to a corporation"); VII Louis Loss & Joel Seligman, *Securities Regulation* 1505 (3d ed. 1991) ("When the issuer itself wants to buy or sell its own securities, it has a choice: desist or disclose"); Richard Jennings & Harold Marsh, *Securities Regulation* 1044 n. 12 (6th ed. 1987) ("the issuer itself is, of course, also covered [by insider trading laws]"); Daniel J. Winnike, *Rule 10b–5's Effect on Employer Stock Repurchases and Option Cancellations on Termination of Employment,* 19 Sec.Reg. L.J. 227, 237–38 (1991) ("there is little doubt that the relationship between a corporation and its shareholders engenders the type of trust and confidence" necessary to trigger the duty to disclose or abstain); *see also Levinson v. Basic, Inc.,* 786 F.2d 741, 746 (6th Cir.1986) ("courts have held that a duty to disclose [merger] negotiations arises in situations such as where the corporation is trading in its own stock"), *vacated on other grounds,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Arber v. Essex Wire Corp.,* 490 F.2d 414, 418 (6th Cir.), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974); *Grigsby v. CMI Corp.,* 590 F.Supp. 826, 830 (N.D.Cal.1984), *aff'd,* 765 F.2d 1369 (9th Cir.1985).[3] *Cf. Glazer v. Formica Corp.,* 964 F.2d 149, 157 (2d Cir.1992) (publicly-held corporation had no duty to disclose because there was no suggestion that corporation was trading in its own stock); *Backman v. Polaroid Corp.,* 910 F.2d 10, 13 (1st Cir.1990) (same).

■ This hardly resolves the issues presented by this lawsuit, however. FAC was required to disclose only *material* information, and to avoid *material* misrepresentations. *McGonigle,* 968 F.2d at 817. Materiality is a separate inquiry, and the crux of this case.

## B. *Material Omissions and Misrepresentations*

In *Basic v. Levinson,* the Supreme Court applied in a § 10(b) case involving undisclosed merger negotiations the standard for materiality it had previously announced in the proxy solicitation context: an omitted fact is material if there is " 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " 485 U.S. at 231–32, 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). The Court also endorsed the method for assessing materiality discussed in *SEC v. Texas Gulf Sulphur,* 401 F.2d 833 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969): materiality depends upon a balancing of the magnitude of the corporate event in question

---

**3.** The particular difficulties posed when the nonpublic information in question concerns negotiations for a merger or sale were aptly summarized by one court over 30 years ago:

> [W]hat is a company to do in circumstances such as these when delicate preliminary but serious negotiations are being conducted at a time when it is desirable to try to buy out a disaffected stockholder? The options seem to us to be: (1) to refuse to disclose and refrain from buying during negotiations; (2) to disclose and attempt to buy during negotiations; and (3) if it clearly appears that the selling stockholder is in no way relying on nondisclosure, to take a chance on litigation....

*Rogen v. Ilikon Corp.,* 361 F.2d 260, 268 (1st Cir.1966) (footnote omitted).

and the likelihood that the event will occur. 485 U.S. at 238–39, 108 S.Ct. at 987.

This case involves a somewhat different application of the concepts of magnitude and probability. We need not determine whether, given the likelihood that FFIC would be sold (indisputably an event of great magnitude), disclosure of the potential sale was required: FAC *did* disclose that a sale was possible. McCormick's argument is that he was not adequately informed about the likelihood itself. He argues that while FAC told him about the possible sale, it omitted or misrepresented those facts which would have shown him just how likely it was that the deal would go through. Had he known those facts, he argues, he would never have sold his securities.

We do not find the authorities cited by either side to be particularly helpful to our task of applying the general principles announced in *Basic* to the facts of this case. Defendant contends that the reasoning in *Taylor v. First Union Corp.*, 857 F.2d 240 (4th Cir.1988), *cert. denied*, 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989), is "dispositive" of this case, but it is not. In *Taylor*, shareholders in Bank A sold their stock to Bank B, which was at the time involved in preliminary merger negotiations with Bank A. These negotiations were not disclosed to the shareholders. The Fourth Circuit reversed a jury verdict in favor of the shareholders and against the banks. The court concluded, first, that the banks' failure to disclose the merger discussions was not actionable because, according to *Basic*, " '[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5,' " and the banks had no such duty. *Taylor*, 857 F.2d at 243 (quoting *Basic*, 485 U.S. at 239 n. 17, 108 S.Ct. at 987 n. 17). In the present case, however, as noted above, FAC, as a repurchaser of its own stock *did* have a duty to disclose material information to the selling shareholder.[4]

The *Taylor* court also held that it did not matter whether or not a duty to disclose

existed, because the omission complained of was not material. But the circumstances in *Taylor* were very different from the circumstances here: in *Taylor*, at the time plaintiffs' stock was purchased, a merger between the two banks would have been *illegal*; it was only after a subsequent Supreme Court decision that it became feasible. 857 F.2d at 244. Moreover, in *Taylor* there had been no actual negotiations or instructions to investment bankers. *Id.* The situation is otherwise here.

Defendant also relies on *Glazer v. Formica*, where the corporate defendant did not tell investors of discussions in which it was engaged with a group which subsequently acquired it in a leveraged buyout. The Second Circuit affirmed summary judgment for the defendant. It did so, however, not because the undisclosed negotiations were immaterial, but rather because the company had no duty to disclose those negotiations. 964 F.2d at 156–57. But again, that argument is unavailable to FAC, because FAC was trading with one of its own shareholders.

The *Glazer* court also held that the first in the series of interactions between the company and the group which led the leveraged buyout was not in itself material activity. *Id.* at 155. This initial contact consisted of a single phone call from the potential buyer, requesting further discussions with the defendant company. *Id.* at 152. This was far less substantial, and far less extended, than the series of interactions which FAC had had with Allianz by May 16. The fact that the phone call in *Glazer* was not material therefore says little about whether or not the contacts between FAC and Allianz were.

Finally, defendant relies on *Starkman v. Marathon Oil Co.*, 772 F.2d 231 (6th Cir. 1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). Defendant does so in error: *Starkman* was decided before *Basic*, and it cited as authoritative a bright-line test for determining the materiality of merger negotiations which the *Basic* Court

---

4. That duty did not obtain in *Taylor* because Bank A, in which plaintiffs were shareholders, did not purchase plaintiffs' shares; while Bank B, which did buy their shares, did not owe any special duty to them because they were not Bank

B shareholders. *See Taylor*, 857 F.2d at 246–47. The situation in *Taylor* was similar to what the situation would have been here if Allianz, rather than FAC, had bought McCormick's stock. But that is not what happened.

rejected. *Compare* 772 F.2d at 243 (citing the "agreement-in principle" test) *with* 485 U.S. at 232–36, 108 S.Ct. at 983–86 (rejecting that test). Defendant's reliance on *Starkman* is misplaced.

The precedent plaintiff cites does not afford much more assistance. McCormick is certainly correct that claims such as his—based on the theory that the investor was not adequately informed of the *likelihood* of some major corporate event—have been recognized under the federal securities laws. *E.g., American General Ins. Co. v. Equitable General Corp.,* 493 F.Supp. 721 (E.D.Va. 1980) (defendant makes some disclosure about pending merger negotiations, but misrepresents the likelihood of success by mischaracterizing the negotiations as "preliminary"). The *facts* of *American General,* however, are not, as plaintiff puts it, "hauntingly similar" to the facts of this case. In *American General,* the defendant flat-out lied to the plaintiff, providing a warranty which stated that defendant was not attempting to negotiate any merger agreement, when in fact it was doing so. *Id.* at 737. No such blatant misrepresentations were made here.

Nor does plaintiff derive much benefit from *Holmes v. Bateson,* 583 F.2d 542 (1st Cir.1978). In *Holmes,* defendants did not tell plaintiff of pending merger negotiations even after they had been advised by their lawyer that the securities laws required disclosure. *Id.* at 556. Eventually, plaintiff's attorney did find out that a merger was planned (whether from defendants or from some other source the opinion does not explain). Even then, however, plaintiff failed to appreciate the favorable consequences of a merger because defendants consistently misrepresented the worth of their own company, and then told plaintiff's attorney that there was not much money to be made out of the merger. *Id.* at 551. Here, by contrast, when FAC disclosed the fact that negotiations with a possible buyer were ongoing, it also made consequences of the projected deal very clear: the market value of McCormick's securities would rise dramatically. Thus unlike the investor in *Holmes,* McCormick

knew that he risked losing greater profits by selling while negotiations were pending.

Plaintiff's other cases are also unhelpful, since they involve defendants who made no disclosure whatsoever. *SEC v. Shapiro,* 494 F.2d 1301 (2d Cir.1974); *Dungan v. Colt Industries,* 532 F.Supp. 832 (N.D.Ill.1982). In short, the case law does not provide us with any easy answers at the level of generality the parties suggest. Rather, we, like the district court, must examine the alleged omissions and misrepresentations one by one and cumulatively, in order to determine whether singly or together they were both misleading and material.

### The eight omissions

1. *FAC retained Lehman Bros., as of January 15, to sell FFIC*

■ A preliminary question is whether this statement, which plaintiff argues should have been made to him, is true. Marto testified that a sale of FFIC as a whole was not discussed at the January 4 meeting, and the testimony of the three persons who attended the meeting indicates that even their discussion about the sale of a minority interest in FFIC was informal (and pessimistic). Moreover, Lusardi testified that when he met with Allianz in February, he was acting on his own initiative. And the FAC executives testified that no formal retainer agreement was drawn up until July.

To contradict these assertions, McCormick points to FAC's November 1990 proxy statement, in which it is stated that Lehman Brothers was "engaged as of January 15, 1990, to act as FAC's agent for the purpose of identifying opportunities for the sale of FAC and/or FFIC and its subsidiaries." This language is picked up from the retainer agreement, which is dated "as of January 15, 1990." The retainer agreement itself, however, clearly was not drafted until long after January 1990.

While it appears to us that the back-dating of the contract was intended to govern rights between Lehman Brothers and FAC rather than to serve as an accurate account of events as they actually occurred, we are nevertheless disturbed by defendant's refusal to

address the references to January 15 in the proxy statement and the retainer agreement itself. We acknowledge that it is possible that the dating of the contract was meant to reflect a recognition that Lusardi was authorized to represent FAC in the months following January 4. Thus it is not entirely clear that the statement plaintiff says should have been included was untrue.

But even if Lusardi was retained on January 15, this was not a material fact. As the district court pointed out, some involvement of investment bankers should have been apparent to McCormick. The time of involvement would not have signalled much about whether negotiations had gone beyond preliminary exploration, and McCormick knew that preliminary discussions had begun. The only fact that McCormick could not have gleaned from the Acknowledgment was that the investment banker had been looking for a possible buyer for several months, and that at some point along the way FAC had given him the green light. But the fact that the banker had been *searching* is subsumed into the fact that he *found* a possible buyer. The details of FAC's arrangements with Lehman Brothers were not material.

### 2. *In February, FAC committed in writing to entertain the sale of FFIC*

Again, a preliminary question is whether this statement is true. We see nothing in the record to support it. On February 21, *Lusardi* wrote to Allianz, and stated that the CFO and CEO would be available for a meeting in late March. Lusardi testified that he learned about the executives' schedules from Marto. But this does not mean that Marto (or anyone else at FAC) committed to anything in writing. FAC can hardly be faulted for omitting to say something that was not true.

### 3. *FAC pursued Allianz and conducted face-to-face negotiations in Germany*

Once again, we must be concerned with the accuracy of the information plaintiff argues should have been disclosed. If anyone "pursued" Allianz, it was Lusardi. Lusardi told Marto about this "pursuit," and Marto put his stamp of approval on it, as reflected in Lusardi's February 21 letter.

Here again, the result of the pursuit is the critical fact, not the pursuit itself. McCormick was told the result: that there had been a preliminary meeting. Arguably, who pursued whom in setting up the meeting was a material fact in establishing FAC's level of interest in the deal, but it is simply not true that FAC was the pursuer. Lusardi was.

■ A fact clearly omitted from the Acknowledgment was that the foreign buyer was Allianz. Plaintiff says that this piece of information alone would have made him decide not to sell his securities: Allianz is a very large insurance company, and plaintiff believed that it had "more money than God."

What McCormick knew was that there had already been discussions and that further discussions had been scheduled. Presumably no buyer would waste its time with such activity if it didn't have the money to buy the target company. However, there may have been something about the size and wealth of Allianz which would have indicated to sophisticated investors that it was more likely to consummate the deal than other potential buyers, serious though they might be. If that were true, then knowing that the buyer was Allianz would at least arguably have altered the total mix of information.

In this case, FAC neither disclosed nor failed to disclose; instead, it told plaintiff that it had certain information (the name of the buyer), but that the information was confidential. McCormick decided to proceed despite FAC's refusal to identify the potential buyer. We conclude, particularly in light of McCormick's considerable sophistication, that this quasi-disclosure was sufficient. We are persuaded by the reasoning of *Jensen v. Kimble*, 1 F.3d 1073 (10th Cir.1993). In that case, as here, a sophisticated investor was offered a favorable deal on his securities; meanwhile, negotiations concerning a crucial event in the life of the corporation (there, a merger) were pending. In *Jensen*, much as in this case, plaintiff knew that the merger was contemplated, and asked defendant to identify the players. Defendant declined to do so. The Tenth Circuit held that this omission was not actionable under Rule 10b–

5 because defendant had "specifically advised" plaintiff of the nondisclosures complained of. 1 F.3d at 1077. In other words, since plaintiff "knew what he didn't know," there was nothing misleading in the omission—and Rule 10b-5 penalizes only those who are responsible for misleading omissions or misrepresentations. *Id.* at 1078.

In this case, similarly, McCormick knew that he didn't know the name of the buyer. Hence, while that information may have been material, defendant's failure to disclose it was not misleading, and hence not actionable.

### 4. *Nonpublic information had already been furnished to Allianz*

■ Once again, the disclosures which were made cured this omission. McCormick knew that a confidentiality letter had been sent; he should have been able to infer from this fact that confidential information would be sent too.

### 5. *After review of nonpublic information, Allianz asked for further discussions*

■ McCormick also argues that the *timing* of FAC's disclosure to Allianz of nonpublic information was important: McCormick's argument is that a company which expresses interest in buying another company after having reviewed confidential information—which may well be unfavorable—is more likely to consummate a transaction than is a company which has asked for further talks without yet having seen the information.

We reject this argument. First, we do not think it pertains to McCormick's situation. Confidential information is often dispatched along with the confidentiality letter. McCormick was told that such a letter had been sent, and as a sophisticated business executive, he should have known that there was at least a possibility that the information itself had been sent along with it.

■ Second, even assuming that this possibility was not apparent to McCormick, the undisclosed fact—the timing of the dispatch of confidential information—was not material in light of the disclosure which was made. McCormick knew that negotiations had begun and indeed had reached a point where

FAC was able to estimate the likely rise in the value of its stock. McCormick was on notice that sale was being contemplated, and contemplated fairly seriously. Details about precisely who knew how much at what stage of the negotiations were just that: details. They did not significantly alter the total mix of information.

### 6. *FAC had agreed to buy back FFIC portfolio assets*

### 7. *FAC had agreed to reinsure up to 50% of FFIC's reserves*

■ In both instances, it would be more accurate to say that FAC had offered to do these things than that it had "agreed" to do them. As defendant points out repeatedly, while FAC made these offers in the May 4 meeting and the May 9 letter, Allianz did not respond to them in any specific way.

McCormick appears to suggest that even the fact that *offers* had been made was material. First, he suggests that the fact that details concerning the structure of the deal had been discussed suggests that the negotiations between the parties had reached a relatively advanced stage. However, the very magnitude of the offers which had been made and not yet accepted (the buy-back of assets would reduce the net price of FFIC by 67%) reveals that major issues still remained to be decided, and that discussions were still in an early stage. In addition, as the district court pointed out, McCormick should have inferred that the transaction had been discussed in at least some detail: otherwise, FAC would not have been able to estimate, even in round numbers, the likely rise in stock price.

Second, McCormick suggests that the fact that FAC was willing to be so flexible showed how eager it was for the sale to go through. Willingness, however, if not eagerness, could have been inferred from the fact that there already had been and would be more discussions with the foreign buyer. Moreover, while flexibility as to structure and reinsurance may have shown eagerness to sell, FAC appears to have been quite inflexible with respect to price; in fact, it appears that the whole deal nearly broke

down in the middle of July because of the parties' inability to agree about price. Thus McCormick would have learned little new about the likelihood that a sale would take place if he had been told FAC was willing to consider various options in structuring the deal.

> 8. *FAC and Lusardi had planned meetings with a tax expert to discuss postsale holding company issues*

■ On May 14, apparently at the request of Marto or Byrne, Lusardi scheduled a meeting between FAC executives and a tax expert at Lehman Brothers; the purpose of the meeting was to discuss tax consequences of the potential transaction, including the consequences if FAC were to come under the 1940 Holding Company Act.

As with many of the omissions above, this was not material in light of the disclosure that *was* made: McCormick knew that FAC was engaged in discussions with a foreign buyer, and could have inferred that some investigation into the tax consequences of the deal would have been concomitant with those discussions.

*The seven misrepresentations* [5]

> 1. *A confidentiality letter was sent to Allianz*

■ McCormick's argument is that this was a misrepresentation because it implied that *only* a letter had been sent, and not that confidential information had been sent too.

Assuming this inference could be drawn, the statement was not materially misleading. McCormick should have inferred that confidential information would soon be sent, or indeed had already been sent along with the letter. *See supra,* discussion of Omissions # 4 and # 5. McCormick was not materially misled about the level of FAC's interest in the deal.

> 2. *Preliminary discussions were about to start*

■ McCormick argues that this statement was misleading insofar as it suggested

that discussions had not already begun. As noted above, however, McCormick admitted that Byrne told him that some discussions had already taken place.

McCormick also takes issue with the word "preliminary," arguing that it is misleading because Lusardi had been talking to Allianz for three months, and "substantive negotiations" were under way. Yet "preliminary" was not a misnomer: FAC itself had only met with Allianz for two hours (the May 4 meeting), and its various suggestions about how the deal might be structured had been neither accepted nor rejected. This statement does not amount to a misrepresentation.

> 3. *The buyer's due diligence had not yet begun*

■ McCormick derives this alleged misrepresentation from the statement in the Acknowledgment that a transaction might take place "after presumably extensive due diligence."

There is no misrepresentation here. First, the statement does *not* indicate that due diligence had not yet begun, but rather that a transaction might go through after due diligence had been completed. Second, even if the statement did imply that due diligence had not begun, McCormick has not pointed to anything showing that it *had* begun. He appears to argue that he knows now that due diligence had already begun because the "agreement" between the parties that FAC would buy back FFIC's non-insurance assets and reinsure FFIC's reserves must have been the result of Allianz's due diligence investigation. But as explained above, there is no evidence of any such agreement; only of an offer by FAC to structure the deal in these ways if desirable.

> 4. *Byrne did not know about the Allianz developments when he proposed the buyout on April 27*

■ Whether or not this statement is true is a matter of conflict within the testimo-

**5.** The first three alleged misrepresentations are contained in the Acknowledgment. The last four were made when McCormick spoke with Byrne after having been briefed by Marto on the substance of the Acknowledgment.

ny of the FAC executives. Byrne testified that between the January 4 meeting with Lusardi, and May 1, when Marto and Brown asked him if they could go to Germany to talk with Allianz, he knew nothing of any discussions about selling FFIC. On the other hand, Brown said he believed Byrne had asked him in March to name a date when it would be convenient for Brown to meet with Allianz.[6]

McCormick does not explain in any detail why it was material that Byrne may have known about Allianz's interest[7] before he approached McCormick with the buyout offer. But McCormick's theory seems to be that if Byrne had the possible sale of FFIC in mind when he made the offer to repurchase McCormick's securities, then possibly his decision to make that offer was motivated by self-interest: if the corporation could recapture the securities before the sale to Allianz, all of the shareholders (including Byrne) could reap some part of profits which McCormick would have gotten if he had held onto his stock.

The relevance of Byrne's motives to the probability that the Allianz deal would go through is not obvious at first glance. The fact that one person is trying to cheat another out of profits by doing x does not necessarily mean that y (on which the scheme also depends) will come about. McCormick may be suggesting, however, that if he knew Byrne was trying to buy him out—at some loss to the company—in the hope that later he and other shareholders would profit from this, then he, McCormick, might have concluded that Byrne actually thought the deal was going to go through (otherwise why accept the short-term loss). And if Byrne was willing to take this risk, then McCormick

might have concluded that in fact the deal probably *would* go through.

The problem with this theory is that the facts don't support it. Byrne's uncontradicted testimony is that far from scheming to enrich himself by buying McCormick's shares, he did not, until he was cautioned by Gillespie, even put the buyout and the possible sale of FFIC together in his mind. More importantly, at the time that Byrne authorized Brown and Marto to attend a meeting with Allianz—whether that was in March or on May 1—he still thought that the deal Lusardi was contemplating involved a sale of a 20% interest in FFIC. Byrne's testimony defeats both the theory that his motive for buying out McCormick was self-dealing, and the theory that from that motive, McCormick could have discerned an increased likelihood that the Allianz sale would go through. Hence any misrepresentation was immaterial as a matter of law.

### 5. *Byrne did not want to sell FFIC*

 McCormick has not shown that this was a misrepresentation. He has shown only that FFIC eventually was sold, not that Byrne wanted to sell it despite his protestations.

But even if Byrne lied, and really *did* want to sell FFIC, that misrepresentation must be evaluated in light of other statements which were made. McCormick was told, and acknowledged that he was told, that FAC was involved in ongoing discussions regarding the sale of FFIC. In light of this disclosure, it would not have been reasonable for him to infer that because Byrne did not want to sell the insurance company, it was unlikely that it would be sold. The fact that FAC was involved in discussions with a possible buyer

---

**6.** In addition, Lusardi wrote in a notation on an April 5 letter to Allianz that "The issue we discussed should be resolved. I believe it comes from the chairman"—that is, Byrne. Although Lusardi testified that he hadn't had any discussions with Byrne at the time, and didn't know what the notation referred to, the notation itself provides contrary evidence.

**7.** FAC argues at one point that it is simply untrue that Allianz demonstrated any interest before April 27—regardless of what Byrne knew or did not know by that date. FAC suggests that the

first expression of interest came on May 14, when Allianz told Lusardi that it was planning a trip to San Francisco to meet with FAC.

But FAC defines the term "interest" too narrowly. It could at least be argued that Allianz showed interest simply by meeting with Marto and Brown on May 4. Accordingly, it could also be argued that if Byrne knew before April 27 that the May 4 meeting was planned, he also knew about Allianz's interest on April 27, and was untruthful when he told McCormick that he didn't.

meant that it was considering selling its subsidiary *despite* whatever reservations Byrne may have had. *See Glazer,* 964 F.2d at 152, 155 (no misrepresentation where company said both that the best thing would be for it to remain independent, and that it would consider any legitimate proposal to acquire the company). Any misrepresentation that was made was immaterial as a matter of law.

### 6. *The potential buyer could not meet Byrne's price*

■ FAC says that this is not a misrepresentation because Allianz would not and in fact never did meet FAC's asking price. FAC wanted $3.5 billion, and Allianz ended up paying just over $3.3 billion.

McCormick appears to argue that the statement was misleading because it indicated not only that Allianz *would not* meet FAC's asking price, but also that it *could not* do so—whereas in fact Allianz had "more money than God." Even such wealth, however, does not necessarily mean that Allianz "could have" met the asking price. A company might be very rich, but still in the minds of—and according to the representations of—its officers, might be unable to meet a given price, within the constraints of the budget available for acquisitions.

In any event, McCormick has not produced any *evidence* showing that Allianz "could" have paid $3.5 billion; and the fact is that Allianz never did. Without knowing in some detail about the finances of Allianz (and we don't), it is a mistake to think we (or McCormick) can make meaningful distinctions between "would not" and "could not." The statement that Allianz could not meet the asking price is not, on the record before us, a misrepresentation.

### 7. *The Allianz development was a sudden one, and was unlikely to materialize*

McCormick testified that the impression he was left with after he had been briefed by Marto and had spoken with Byrne was that Allianz representatives had first called that day or the day before. McCormick also states that Byrne told him that the chances

the deal would go through were not greater than 50–50.

Taking the second point first, there is nothing in the record that shows that on May 16, the chances that the deal would come off *were* any greater than 50%; indeed, nearly two months later the deal nearly broke down.

As for the impression that the Allianz development was very recent, this was in large part correct. Allianz had announced that it was interested in further talks only two days before Marto and Byrne briefed McCormick; before that, the only face-to-face discussions between the two parties had occurred at the May 4 meeting, during which Allianz was noticeably unresponsive. Moreover, McCormick was told that there had already been preliminary discussions; whether those had taken place one day ago or twelve days ago is not material.

### Conclusion

■ In *Basic v. Levinson,* the Supreme Court listed several factors indicating that a merger or acquisition is likely to materialize: "board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries." 485 U.S. at 239, 108 S.Ct. at 987. In this case, while there had not yet been any board resolution, the principals had begun to negotiate, and were about to engage in a round of much more intensive discussions. For nearly three months, FAC's investment banker had been authorized by FAC's CFO to discuss the sale of FFIC. Under these circumstances, there is at the very least a question of fact as to whether or not the Allianz development was material. Because FAC disclosed some information to McCormick, we must decide whether or not that disclosure was sufficient.

There is no question but that there were many details about which McCormick was not told: for example, he was not told about the involvement of the investment bankers, the disclosure of confidential information to the buyer, or the substance of the May 4 meeting and the meetings and correspondence between Lusardi and Allianz which had preceded it. McCormick *was* told that there had been meetings and that there would be further meetings, and he was told

this by FAC's top command. He was also told that in the event of a sale, his stock could rise in value to $50/share. In light of these disclosures, details pertaining to the activity which had led up to FAC's meetings, and to what had transpired in those meetings, diminished greatly in importance. It was self-evident that activity not described in detail had occurred.

In sum, although the disclosure which was made was both general and succinct, the details McCormick claims he was deprived of would not have added useful information. McCormick was a sophisticated businessman, and he was the former CEO of FFIC and a director of FAC at the time of the events in question. His reading of the Acknowledgment must be seen against that background. The disclosures which the Acknowledgment reflects told him enough. More details would not have significantly altered the total mix of information. After all, there was no deal with Allianz, and no assurance whatsoever that there would be one. McCormick was advised, in effect, that if there were an offer, FAC would not sell without achieving about $50/share. The disclosures were accurate, and the information was adequate for McCormick to act upon. Nor was anything which was set forth in the Acknowledgment or said by Marto or Byrne both material and misleading. McCormick's Rule 10b–5 claim therefore fails.[8]

## II

### State-law Claims

Plaintiff also brought claims for violation of state securities laws (Cal.Corp.Code §§ 25401, 25501 & 25504.1), breach of fiduciary duty, fraud and deceit, negligent misrepresentation, and rescission. The district court ruled, and defendant argues again on appeal, that summary judgment dismissing these claims was warranted for the same reason that it was warranted with respect to the federal securities claims: lack of any misrepresentation or omission of a material fact.

Plaintiff argues that federal standards of materiality do not apply to his state claims. But this argument is belied by several authorities. *Grigsby v. CMI Corp.*, 590 F.Supp. 826, 833 (N.D.Cal.1984) (analysis of materiality under federal securities law also disposes of plaintiffs' claims based on California securities statutes and common-law fraud), *aff'd*, 765 F.2d 1369 (9th Cir.1985); *Insurance Underwriters Clearing House v. Natomas Co.*, 184 Cal.App.3d 1520, 228 Cal.Rptr. 449, 453–54 (1986) (in context of merger negotiations, court applies pre-*Basic* federal standard to common-law claim of negligent misrepresentation); *Lynch v. Cook*, 148 Cal.App.3d 1072, 196 Cal.Rptr. 544, 550, 553 (1983) (court applies objective, federal standard to claims of fraud, negligent misrepresentation, fraud by a fiduciary, and violation of state securities statutes). Plaintiff also argues, citing *Wood v. Kalbaugh*, 39 Cal.App.3d 926, 114 Cal. Rptr. 673, 676 (1974), that when a claim for rescission is based on fraud, the misinformation in question need not be material. But since the cited cases hold that in the securities fraud context a claim of fraud itself requires a material misrepresentation, it defies logic to say that a claim for rescission which is *based* on allegations of securities fraud requires anything less.

Plaintiff also argues that his claim for breach of fiduciary duty does not depend on the showing of any fraud at all: he argues that under such cases as *Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969), defendant owed him a special and higher duty of "inherent fairness." The duty which is derived from *Jones*, however, exists only between majority and minority shareholders. *Lynch v. Cook*, 196 Cal.Rptr. at 549 n. 8, 551; *see Grigsby*, 590 F.Supp. at 834. Here, no controlling shareholders are alleged to have been involved.

## III

### Motion to Extend Discovery

After the discovery period had closed, McCormick moved for an extension of the

---

8. Since plaintiff's failure to establish the materiality of the omissions and alleged misrepresentations is dispositive of his claim, we do not reach defendant's other arguments for summary judgment in its favor: lack of scienter, and the preclusive effect of a general waiver signed by McCormick.

discovery cutoff date and for judicial assistance in taking overseas depositions. The district court considered this motion in conjunction with FAC's summary judgment motion, and treated it as a Fed.R.Civ.P. 56(f) request to continue summary judgment until further discovery had been conducted.

Under Rule 56(f), the party seeking the continuance must show that it lacks the "facts essential" to resist the summary judgment motion. The standard of review is abuse of discretion, *California Union Ins. v. American Diversified Sav. Bank*, 914 F.2d 1271, 1278–79 (9th Cir.1990), *cert. denied*, 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991), although McCormick argues, not unreasonably, that insofar as the argument on appeal is that the district court's Rule 56(f) determination is made on the basis of a misunderstanding of some legal principle, review should be de novo.

The additional discovery McCormick wished to conduct consisted of taking the depositions of Friedrich Schiefer, chief financial officer at Allianz, and Alexander Hoyos, a senior vice president at Allianz. McCormick asserted that both Schiefer and Hoyos would have testified about additional Allianz/FAC communications between May 4 and May 16, in which price and terms were discussed further.

The district court concluded that this testimony would have made no difference on summary judgment, because the allegedly omitted material would not have altered the total mix of information available to McCormick. We agree. With respect to both price and the structure of the sale, the district court correctly pointed out that McCormick should have been able to infer that these items had been discussed from the fact that FAC was able to estimate the rise in the price of FAC stock if the sale were to take place. The district court neither misunderstood any controlling legal principle nor abused its discre-

tion in denying plaintiff's request under Rule 56(f).[9]

**AFFIRMED.**

---

9. McCormick also sought to depose Gianluigi Gabetti, a former FAC director. Gabetti would have testified that Byrne did *not* inform McCormick that the possible foreign buyer was Allianz. Apparently Byrne had maintained at one point that he had conveyed that information to McCor-

mick, while McCormick, of course, said the opposite. The district court properly drew the inferences in favor of the non-moving party, and assumed (as we must assume also) that McCormick was *not* told the name of the buyer. This obviated the need for Gabetti's testimony.