86 P.3d 1175 (2004)
John GUARINO, an individual; and Ryan Smith, an individual, Appellants,
v.
INTERACTIVE OBJECTS, INC., a Washington State Corporation; and Northwest Capital Partners, L.L.C., a Washington State Limited Liability Company; and Steven G. Wollach, husband and wife, and the marital community composed thereof; and Brent Nelson and Jane Doe Nelson, husband and wife, and the marital community composed thereof; and Thad E. Wardall and Jane Doe Wardall, husband and wife, and the marital community composed thereof, Respondents.
No. 50356-1-I.
Court of Appeals of Washington, Division 1.
March 22, 2004.
*1178 Paul Arthur Spencer, Spencer Law Offices PLLC, Bellevue, WA, James Alexander Smith, Smith & Hennessey PLLC, Seattle, WA, for Respondents.
E. Duane Golphenee, Duane Golphenee PS, John Burton Farver, Peick & Associates PS, Bellevue, WA, for Appellants. *1176
*1177 APPELWICK, J.
A dispute over employment severance benefits between a corporation and two former executives proceeded to mediation, which resulted in Settlement Agreements. The dispute did not involve any issues regarding corporation stock. Nonetheless, the Settlement Agreements included provisions allowing the corporation to purchase the appellants' founder's shares of stock. Subsequent to the purchase of the appellants' shares of stock, the corporation's stock subsequently increased greatly in value. The appellants brought suit alleging claims of Washington State Securities Act (WSSA) violations, fraud, negligent misrepresentation, and breach of fiduciary duty based on the corporation's failure to disclose material information which affected the value of the stock. The trial court ruled in favor of the respondents on all claims. Its conclusions were based largely on determinations that the respondents had not misrepresented or omitted material facts and that the adversarial relationship between the appellants and respondents foreclosed the appellants' right to rely on the respondents' representations. We disagree.
We conclude that the respondents had a duty under the WSSA to disclose material information about a merger with Avatar or to abstain from purchasing the appellants' *1179 stock. Respondents breached this duty. Appellants were entitled to rely on the facts as stated, notwithstanding their adversarial positions relative to the employment dispute. The appellants are entitled to a trial on the issue of damages.
While we affirm the trial court's dismissal of the breach of fiduciary duty claim, we reverse the dismissal of the claims for violation of the WSSA, fraud, and negligent misrepresentation. The record establishes the appellants are entitled to judgment on those claims. We remand for entry of judgment in favor of appellants, and for a determination of damages and attorney fees.

FACTS
In 1995, appellants Ryan Smith and John Guarino, along with a third party not involved in this suit, founded Interactive Objects, Inc. (IObjects), a start-up technology company. Smith was its Chief Executive Officer (CEO) and director from the company's inception until his resignation. Guarino was its Vice President for product development and on its Board until his resignation. Defendant Steve Wollach was IObjects' Chief Financial Officer (CFO) and on its Board from the fall of 1997 until the fall of 1998. He assumed presidency of the company upon the appellants' resignations in October 1998. Defendants Brent Nelson and Thad Wardall were on IObjects' Board. Defendant Northwest Capitol Partners (NWCP) was a venture capital company serving as IObjects' financial advisor and a party to the Settlement Agreement underlying this dispute.
Smith and Guarino worked without compensation for the first two years of the company's existence. In a reverse merger in 1997, IObjects became a publicly traded company. At the time of the merger, Smith received 1,680,000 shares of founder's stock and Guarino received 1,200,000 shares of founder's stock. Together they held a combined 2.8 million shares, approximately 20 percent of IObjects' total outstanding shares. Their shares were restricted under Securities Exchange Commission (SEC) Rule 144 and could not be sold on the open market until after September 17, 1999. In January 1998, IObjects and the appellants signed Employment Compensation Agreements (original Compensation Agreements). The agreements provided that the appellants were to receive three months' salary in the event they were terminated for no cause. The agreements did not contain a provision conferring upon IObjects' the right to repurchase appellants' company stock in the event of employment termination.
In July 1998, IObjects executed Amended Compensation Agreements for the appellants. The amended agreements stipulated that the appellants were to receive one year's salary, paid monthly in twelve equal installments, upon termination for any reason other than fraud. Like the original Compensation Agreements, the Amended Compensation Agreements provided that except for workers' compensation claims or unemployment compensation claims, the parties were to resolve employment disputes through mediation, and, in the event mediation failed, through binding arbitration. Finally, like the original Compensation Agreements, the Amended Compensation Agreements contained no stock buyback provision.
IObjects planned to introduce its only two products, the Visual Gateway Interface (VGI) and the Visual Mail Interface (VMI), onto the market in the spring of 1998. Anticipating the commercial success of the two products, IObjects also initiated an equity drive, raising approximately $6 million, primarily from European investors who paid $4 per share. Shortly thereafter, it became evident that both the VGI and the VMI were financial failures.
In July 1998, IObjects lost what had been its only significant source of revenue, a consulting contract with Safeco Insurance. The Safeco account was worth between $3 and $4 million to IObjects. In the first three quarters of 1998 IObjects lost over $3 million. IObjects' shares dropped to a low of $1.40 per share less than three months after the European investors had paid $4 per share. The Safeco consulting contract was awarded to Avatar Corporation (Avatar), which had been IObjects' main subcontractor when IObjects previously held the Safeco contract.
*1180 Partly in response to pressure from European investors, Smith resigned as CEO of IObjects at a Board meeting on October 8, 1998. Guarino resigned on October 12, 1998. Following their resignations, the appellants requested payment of the severance benefits as provided in the Amended Compensation Agreements. IObjects refused to honor their severance benefits. This case arises out of IObjects' solicitation of a buyback of the appellants' stock shares during the negotiation and settlement of the appellants' severance claims.
The record indicates that prior to the severance negotiations in February 1999, the respondents solicited a repurchase of appellants' stock. Smith testified that Nelson called him in October 1998 to arrange a meeting with him, Wardall, and Guarino to discuss IObjects' repurchase of their shares. The record indicates that Nelson's proposed meeting never occurred because the appellants had been advised by their attorney to have no contact with the respondents. On October 22, 1998, Nelson, as Managing Partner of NWCP, also sent an offer to the appellants' attorney offering to purchase Smith's stock. The appellants refused that offer.
Wollach also solicited an offer to repurchase the appellants' shares on IObjects' behalf. The parties agree that from late October 1998 to November 18, 1998, the appellants were in contact with Wollach on three occasions. The three contacts between Wollach and the appellants in October and November 1998 are the basis for the appellants' claim that IObjects fraudulently induced them to sell their shares below market value. The first two of those contacts were phone calls Wollach placed to the appellants on or about October 30, 1998. During those calls, Wollach discussed IObjects' poor financial condition and high "burn rate."[1]
On November 18, 1998, Smith, Guarino, and their trial attorney, Ramer Holtan, met with Wollach and Paul Spencer, IObjects' attorney, to discuss settlement of their severance claims. At that meeting, Wollach offered to repurchase the appellants' stock for approximately $0.20 per share.[2] Holtan replied by asking for a disclosure of the state of the company. Smith testified that Wollach answered that IObjects had no products, no new contracts "worth anything," and no intellectual property. In sum, Wollach represented that IObjects' financial outlook was dismal. He also stated that acquisition of or merger with another company was imperative if IObjects were to survive, and that IObjects' purchase of the appellants' stock was requisite for acquisition of or merger with another company. Wollach also disclosed at the November 18 meeting that IObjects had an outstanding letter of intent to merge or acquire an East Coast Company. He did not inform the appellants that IObjects had discussed a merger with Avatar.
The day after Wollach's November 18 meeting with the appellants, IObjects signed a letter of intent to merge or acquire Avatar. The letter of intent with Avatar stated that "[u]ntil these negotiations are concluded by either party with written notice to the other, which period of time shall not be less than 90 days, Seller shall not negotiate with any other party with respect to the sale of equity or assets of Avatar Interactive." The letter of intent did not include a purchase price. On November 19, IObjects and Avatar signed a Mutual Nondisclosure Agreement.
The record is unclear as to why IObjects refused to honor the appellants' Compensation Agreements.[3] On November 25, 1998, *1181 the appellants filed a claim to initiate the alternative dispute resolution process, as required under their Employment Compensation Agreements, against IObjects for failure to pay them severance benefits. On February 2, 1999, the parties mediated their severance dispute under attorney Peter Byrnes. All parties to this litigation attended and participated in the mediation. The settlement reached there was memorialized in a Memorandum of Settlement on February 4, 1999. It was later formalized in a written Mutual Release and Settlement Agreement (Settlement Agreement), signed by Smith and Guarino on March 4, 1999, and signed by the respondents on March 8, 1999.
The Settlement Agreement retained the "Indemnification" provision and the "Invention, Confidentiality, Nonraiding and Noncompetition" clauses of the Amended Compensation Agreements. Smith and Guarino would also continue to receive Directors and Officers Insurance (D & O) insurance coverage from IObjects, and IObjects would pay appellants' attorney fees. However, the Settlement Agreements did not provide for payment to the appellants of a year's salary as sought under the Amended Compensation Agreements. It provided for dismissal of the appellants' arbitration against IObjects.
The Settlement Agreement also entitled IObjects' to an immediate repurchase of 550,000 shares of stock from Smith, and 400,000 shares of stock from Guarino, at $.50 per share. In addition, IObjects received the right to purchase the balance of Smith's shares and up to 500,000 of Guarino's remaining shares at $.50 per share under a staggered purchase schedule. Guarino elected to retain 300,000 shares of his stock.
The Settlement Agreement stated that it applied to employment claims up to the date of the appellants' resignations; in Smith's case, to October 8, 1998 and in Guarino's case to October 12, 1998. It expressly preserved the appellants' claims as shareholders and preserved claims arising after the dates of their resignation from IObjects.
The appellants were not informed of IObjects' pending merger with Avatar at any time prior to March 4, 1999, the date on which they signed the Settlement Agreement. On March 5, 1999, IObjects and Avatar signed a second letter of intent which, unlike the November 19 letter of intent, included a purchase price. On March 8, 1999, IObjects signed the Settlement Agreement. On March 31, 1999, IObjects and Avatar signed an Agreement and Plan of Merger.
Between March 1999 and September 2000, the respondents exercised, or assigned to IObjects' European investors, all of its repurchase options except for 25,000 of each appellant's shares of stock. Approximately 858,000 shares of IObjects' stock was subsequently sold to Avatar, at a price ranging from $1.25 to $2.25 per share, as part of its acquisition deal. On September 13, 2000, IObjects attempted to purchase the remaining 25,000 shares held in escrow under each of the appellant's Settlement Agreements. Both appellants directed the escrow agent to reverse the transaction and not honor the final option payment.
On April 19, 1999, IObjects issued a Press Release announcing its merger with Avatar.
*1182 On April 27, 1999, it issued a Press Release announcing Microsoft's purchase of its digital audio player technology and a contract for IObjects' further development of Windows desktop utilities. Over the next year the value of IObjects' stock share price increased significantly.[4] Shortly thereafter, Smith and Guarino filed suit against the respondents. Alleging that IObjects had fraudulently induced them to sell their shares at a discounted $.50 per share, they pleaded that IObjects had violated the WSSA, fraud, negligent misrepresentation and breach of fiduciary duty. Following trial, the trial court dismissed all of appellants' claims. The appellants argue on appeal that the trial court's Findings of Fact and Conclusions of Law are unsupported by the record.

ANALYSIS
I. Standard of Review
This court's review of a trial court's findings of fact and conclusions of law is a two-step process. Landmark Dev., Inc. v. City of Roy, 138 Wash.2d 561, 573, 980 P.2d 1234 (1999). First, the court must determine if the trial court's findings of fact were supported by substantial evidence in the record. If so, the court must then determine whether those findings of fact support the trial court's conclusions of law. Landmark, 138 Wash.2d at 573, 980 P.2d 1234. "[F]actual issues will not be retried on appeal. The [trial] court's findings of fact will be accepted as verities on appeal as long as they are supported by substantial evidence in the record." In re Marriage of Thomas, 63 Wash.App. 658, 660, 821 P.2d 1227 (1991). "`Substantial evidence' exists when there is a sufficient quantum of proof to support the trial court's findings of fact." Org. to Preserve Agricultural Lands v. Adams County, 128 Wash.2d 869, 882, 913 P.2d 793 (1996). "Conflicting evidence is substantial if that evidence reasonably substantiates the finding even though there are other reasonable interpretations." Sherrell v. Selfors, 73 Wash.App. 596, 600-01, 871 P.2d 168 (1994), rev. denied, 125 Wash.2d 1002, 886 P.2d 1134.
As the challenging party, Smith and Guarino bear the burden of showing that the findings are not supported by the record. Standing Rock Homeowners Ass'n v. Misich, 106 Wash.App. 231, 243, 23 P.3d 520 (2001)(citing Panorama Village Homeowners Ass'n v. Golden Rule Roofing, Inc., 102 Wash.App. 422, 425, 10 P.3d 417 (2000)). We review conclusions of law de novo. Rasmussen v. Bendotti, 107 Wash.App. 947, 954, 29 P.3d 56 (2001).
II. The Washington State Securities Act
The appellants assert that the respondents violated the WSSA when it failed to make a number of disclosures to them in negotiating its repurchase of their stock.
RCW 21.20.010 states in relevant part:
It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
(1) To employ any device, scheme, or artifice to defraud;
(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
RCW 21.20.010. Because the primary purpose of the WSSA is to protect investors, it is construed liberally. RCW 21.20.010; Douglass v. Stanger, 101 Wash.App. 243, 2 P.3d 998 (2000). The WSSA also requires reliance upon the alleged misrepresentations or omissions. Hines v. Data Line Systems, Inc., 114 Wash.2d 127, 134, 787 P.2d 8 (1990). Reliance may be implied when the defendant omits to disclose a material fact. Morris v. International Yogurt, 107 Wash.2d 314, 328, *1183 729 P.2d 33 (1986); Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).
We will consider in turn (1) if the respondents owed a duty under the WSSA to disclose or abstain from its repurchase of the appellants' shares; (2) if there was a material omission; (3) upon which the appellants relied; and (4) who among the respondents may be liable.
A. Duty to Disclose
The trial court concluded that the respondents owed the appellants "no special fiduciary duty" under the WSSA because due to the parties' adversarial relationship they lacked the requisite trust and reliance requisite for that fiduciary duty to exist.
As our cases have noted, the WSSA "is patterned after and restates in substantial part the language of the federal [Securities Exchange Act] of 1934."[5]Clausing v. DeHart, 83 Wash.2d 70, 72, 515 P.2d 982 (1973); See also, Shermer v. Baker, 2 Wash.App. 845, 848-49, 472 P.2d 589 (1970). RCW 21.20.900 provides that the WSSA is "to be construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of [chapter 21.20 RCW] with ... related federal regulation." RCW 21.20.900; Kittilson v. Ford, 93 Wash.2d 223, 608 P.2d 264 (1980); West v. Drexel Burnham Lambert, Inc., W.D. Wash.1985, 623 F.Supp. 26, 29 (1985). The related federal regulations are Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. section 78j(b), and Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. section 240.10b-5 (Rule 10b-5).
Federal courts have interpreted Rule 10b-5 to prohibit trading on the basis of inside information so that corporate insiders who have nonpublic information cannot take advantage of that information to purchase or sell corporate securities in the marketplace. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2nd Cir.1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In Texas Gulf the court held that corporate officers had violated Rule 10b-5 by trading in their company's securities with nonpublic information that the company had discovered a major ore reserve. Texas Gulf, 401 F.2d at 848. In so holding, the court stated that "anyone in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it ..., or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed." Texas Gulf, 401 F.2d at 848. In Chiarella v. United States, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), the United States Supreme Court identified two reasons supporting the duty to "abstain" or "disclose[ ]": it arises from "(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." Chiarella, 445 U.S. at 227-28, 100 S.Ct. 1108.
Cases have emphasized that the 1934 Act's "fair play" philosophy, which lies behind the `disclose or abstain' rule, applies "not only to majority stockholders of corporations and corporate insiders, but equally to corporations themselves when acting through their officers, directors, or agents." Kohler v. Kohler Co., 319 F.2d 634, 638 (7th Cir.1963). Thus, federal courts have applied the abstain or disclose rule where the insider is an issuer corporation seeking to repurchase its shares *1184 from a former employee. McCormick v. Fund American Companies, Inc., 26 F.3d 869, 876 (9th Cir.1994)[6] (finding a duty to disclose where a shareholder corporation repurchased a former director's shares); Powers v. British Vita, P.L.C., 57 F.3d 176, 188-89 (2nd Cir.1995) (finding fiduciary relationship between directors/majority shareholders and a fellow director/minority shareholder creating duty to disclose in negotiations over resignation package); Smith v. Duff and Phelps, Inc., 891 F.2d 1567, 1572-75 (11th Cir.1990) (duty to disclose merger negotiations to an employee who departs voluntarily and cashes in his shares as a condition of termination), overruled on other grounds, Henderson v. Scientific-Atlanta, Inc., 971 F.2d 1567 (11th Cir.1992).
This court articulated the general principles of duty which flow from the WSSA, RCW 21.20.010, in Shermer, 2 Wash.App. at 850, 472 P.2d 589. In Shermer, an action was brought by minority stockholders against majority stockholders through whom they sold their stock to the corporation. Shermer stated:
"The rule is clear. It is unlawful for an insider, such as a majority stockholder, to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known to the majority stockholder by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction. Some courts have called this a fiduciary duty while others state it is a duty imposed by the `special circumstances.'"
Shermer, 2 Wash.App. at 850, 472 P.2d 589 (quoting Speed v. Transamerica Corp., 99 F.Supp. 808, 828 (D.C.Del.1951)).
Shermer's application of the WSSA to situations in which an insider is privy to knowledge of material facts not known by a shareholder with whom he is dealing is consistent with the abstain or disclose rule under federal Rule 10b-5. Shermer, 2 Wash. App. at 850, 472 P.2d 589. We are persuaded that the abstain or disclose rule effectuates the paramount purpose of the WSSA, to protect investors. Under the WSSA, a corporation and its insiders owe a duty to either disclose material, nonpublic information, or to abstain from trading in the company's own *1185 securities. The respondents are clearly insiders subject to this duty.
The respondents contend that even if a duty to disclose exists in general, no such duty should be found in this case. They argue that because the appellants resigned only six weeks prior to their November 18 meeting with Wollach, they "were hardly uninformed outside shareholders." We reject this argument.
It is clear that a shareholder's former role as an officer or director of an issuer corporation does not foreclose operation of the disclose or abstain rule. McCormick, 26 F.3d at 876. The respondents' argument implies that the appellants knew or should have known insider information because they had resigned less than a month before their November 18 meeting with Wollach. Actual knowledge would defeat a WSSA claim. But the respondents do not assert that the appellants actually knew of the alleged material information omitted. Moreover, the appellants could not have known it prior to their resignations because the alleged material information flows from actions occurring after their resignations from IObjects. The WSSA does not specify a different level of duty owed to a former insider or anyone with more sophisticated knowledge of securities which would support a theory that the appellants should have known such information. Adopting the respondents' argument would be inconsistent with case law applying the duty to transactions with former officers and would substantially undercut the WSSA. Rather, we are bound to liberally construe the WSSA. RCW 21.20.010.
The respondents owed a duty under the WSSA to disclose material facts or to abstain from their stock transaction as a matter of law.
B. Materiality of Omitted Information
We next review whether the alleged omissions were material facts and whether the trial court erred in concluding that the appellants failed to prove the respondents materially misrepresented or omitted facts in breach of its duty to disclose when it repurchased the appellants' shares.
A "material fact" is one "to which a reasonable [person] would attach importance in determining his or her choice of action in the transaction in question." Aspelund v. Olerich, 56 Wash.App. 477, 481-82, 784 P.2d 179 (1990); Shermer, 2 Wash.App. at 855, 472 P.2d 589. For an undisclosed fact to be material, "`there must be a substantial likelihood that the disclosures of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting TSC Indust., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). In the context of repurchase negotiations, material facts include those that "affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities." Texas Gulf, 401 F.2d at 849. When contingent or speculative events are at issue, the materiality of those events depends on "`a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" Basic, 485 U.S. at 238, 108 S.Ct. 978 (quoting Texas Gulf, 401 F.2d at 849).
The respondents suggest that the materiality of the alleged nonclosures should be its materiality on November 18, 1998, the date on which Wollach stated that IObjects had "no revenues, no customers, no intellectual property, and no business prospects." We disagree.
The duty to disclose or abstain is on-going. It exists because of the relationship between an insider and shareholders, and endures through the securities transaction. It is the transaction that triggers a WSSA claim. Materiality is determined relative to the date of the sale, not merely the date of any communications. We therefore analyze the materiality of the alleged omissions as of March 8, 1999, the date on which the last parties signed the Settlement Agreement.
The appellants allege that Wollach's November 18 statement that IObjects had "no revenues, no customers, no intellectual *1186 property, and no business prospects" constituted material misrepresentations and omissions in conjunction with the repurchase of their stock. More specifically they allege that IObjects failed to disclose to them (1) its impending merger with Avatar; (2) its development of its MP3 product; (3) its Microsoft contract and other impending business developments; and (4) its changed business model. The trial court found that none of the four allegations were material.
First, the appellants allege that Wollach failed to disclose its impending merger with Avatar in order to induce them to sell their founders' shares back to IObjects at a reduced price. At the November 18, 1998 meeting with appellants, Wollach stated the necessity of a merger for IObjects to survive, and that the stock buyout was necessary for a merger to occur. He mentioned an existing letter of intent and possible merger with a New York company.[7] Yet he did not disclose that IObjects was also contemplating a merger with Avatar.
The day after the November 18 meeting, IObjects signed a letter of intent with Avatar. That letter expired in 90 days and did not state a purchase price or purchase terms. Kayleen Arafiles, President of Avatar at the time, testified that beginning in December 1998 the two companies began to hold negotiations and conduct due diligence. By late January or early February, IObjects and Avatar had discussed a price and purchase terms.
On March 4, 1999, Smith and Guarino signed Settlement Agreements. On March 5, 1999, IObjects' Board authorized a merger with Avatar and the two companies signed a second letter of intent, indistinguishable from the first letter of intent except for the addition of a purchase price. On March 8, 1999, the Settlement Agreements with Smith and Guarino were finalized. IObjects and Avatar signed an Agreement and Plan of Merger on March 31, 1999.
Even if IObjects' merger with Avatar was preliminary on November 18, 1998, the merger was certainly less speculative on February 4, 1999, the date of the parties' mediation. IObjects asserts that because the merger was prospective it was not material. We disagree.
The prospective nature of a company's merger negotiations is not necessarily dispositive of materiality. The key question is not whether negotiations are preliminary, but rather, whether a reasonable investor would consider the fact material in making his or her investment decision. Basic, 485 U.S. 224, 108 S.Ct. 978. A Ninth Circuit case analyzing whether prospective plans are material under the WSSA also persuades us to reject IObjects' argument. Nelson v. Serwold, 576 F.2d 1332 (9th Cir.1978), cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).
In Nelson, the heir of a deceased stock-holder sought to determine the value of the deceased's stock in Poulsbo Telephone (Poulsbo) and wrote to Poulsbo inquiring into the "status" of the company's stock in 1962. Nelson, 576 F.2d at 1334-35. Several years prior to the heir's inquiry, Serwold, the President of Poulsbo, motivated by a plan to develop the company into a marketable enterprise, had successfully formed a "control group." Nelson, 576 F.2d at 1334. The seller erroneously thought the value of the stock was $5 per share. Nelson, 576 F.2d at 1336. Poulsbo did not disclose to the seller either the existence of the control group nor its goal to become a marketable enterprise. The heir ultimately sold his shares back to Poulsbo in 1965 for $6.94 per share. Nelson, 576 F.2d at 1335. At that time, the book value of the stock was $60 per share. Nelson, 576 F.2d at 1335. Also in 1965, Serwold "received feelers" from persons interested in purchasing the company's stock. Nelson, 576 F.2d at 1335. When Poulsbo was ultimately sold to another telephone company in 1971, the book value of its shares climbed to $163.00. Nelson, 576 F.2d at 1335.
The heir brought suit, alleging that Serwold's failure to disclose the company's long-term plans was a material misrepresentation *1187 under Rule 10b-5 of the 1934 SEC, 15 U.S.C. section 78j(b), and under its Washington counterpart, the WSSA, RCW 21.20.010. Nelson, 576 F.2d at 1332. The Ninth Circuit affirmed the district court's findings that Serwold's failure to disclose Poulsbo's "long-range plan" was a material misrepresentation within the meaning of Rule 10b-5. Nelson, 576 F.2d at 1336.
The intended Avatar merger was certainly more imminent than the acquisition planned under Poulsbo's "long-range plan[s]." The Board approved the merger plan the very day after Smith and Guarino signed Settlement Agreements. Under Nelson, the fact that IObjects' letter of intent with Avatar was prospective or merely part of a plan clearly does not preclude the potential merger from being a material fact. Under Nelson, the Avatar merger was a material fact.
Wollach had indicated in November that IObjects needed a merger partner to survive. Even if this statement is regarded as an absolute, the disclosure is insufficient. In McCormick, the defendant corporation had informed the former officer of a pending merger, but not with whom. McCormick, 26 F.3d at 875. However, McCormick was also informed that the merger would not proceed unless the corporation's stock value rose to $50 per share. McCormick, 26 F.3d at 884. He was thus able to evaluate what his losses might be if he agreed to complete the repurchase transaction. McCormick, 26 F.3d at 884. The stock value rose as a result of the merger. McCormick, 26 F.3d at 884. The trial court's summary judgment dismissal was upheld. McCormick, 26 F.3d at 883-84. In contrast, in this case, the appellants did not have knowledge of the identity of the potential merger partner or of other facts which would be material to evaluate a potential increase or decrease in the value of their stock. Thus, unlike McCormick, they were unable to evaluate what they stood to lose or gain in their transaction.
IObjects lost its Safeco consulting contract, worth $3 to $4 million dollars, to Avatar in July 1998. Its loss was a significant factor in creating IObjects' precarious financial condition. If the appellants knew Avatar was a potential merger partner, they would have reason to believe that merger with Avatar would favorably alter IObjects' financial condition, providing the company with several million dollars in Safeco revenue, both as a means to support its product development initiative as well as stave off the threat of lawsuits from angry European investors. It is extremely difficult to envision how this information would not significantly alter the mix of information relative to the stock sale for a reasonable investor, and virtually impossible that it would not have done so for the appellants. The trial court erred in concluding that IObjects' merger negotiations with Avatar were not material.
Having concluded the Avatar merger was a material fact and its omission was misleading, we need not address the other alleged omissions nor the issue of cumulative effects.
C. Reliance
Identification of a material fact which was omitted does not end the inquiry. In order to recover damages in an action under the WSSA, normally an aggrieved party must show a right to rely on the representation as made. Hines v. Data Line Systems, Inc., 114 Wash.2d 127, 134, 787 P.2d 8 (1990). In a case involving an omission to disclose a material fact, however, "positive proof of reliance is not a prerequisite to recovery." Morris, 107 Wash.2d at 328, 729 P.2d 33 (quoting Affiliated Ute Citizens, 406 U.S. at 153-54, 92 S.Ct. 1456) (in a face-to-face securities transaction between a seller and purchaser where the defendant purchaser omitted to state material facts, the plaintiff's reliance can be presumed from the materiality of the omissions). In such cases, a defendant may rebut the presumption of reliance upon a finding of materiality by showing that the plaintiff's decision would have been unaffected even if the omitted fact had been disclosed. Basic, 485 U.S. 224, 108 S.Ct. 978; Morris, 107 Wash.2d at 328-29, 729 P.2d 33. Thus, upon a finding of materiality there is a rebuttable presumption that the plaintiff shareholder relied upon the omission. "Advocates of the rebuttable presumption acknowledge that the defendant may encounter similar difficulties in proving nonreliance as those the plaintiff would face in proving reliance. *1188 However, since it is the defendant's nondisclosure that has made proof difficult, it is proper to require the defendant to bear such difficulties." Morris, 107 Wash.2d at 329, 729 P.2d 33.
Here, IObjects has failed to rebut the presumption by showing that the appellants' decision regarding the sale of their shares would have been unaffected had IObjects disclosed material information.
The respondents contend that the adversarial context in which IObjects' repurchase of appellants' shares occurred foreclosed the appellants' right to rely on the respondents' statements or omissions. They urge us, as they successfully urged the trial court below, to rely upon an Eleventh Circuit case, Mergens v. Dreyfoos, 166 F.3d 1114 (11th Cir. 1999), cert. denied, 528 U.S. 820, 120 S.Ct. 63, 145 L.Ed.2d 55 (1999). The Eleventh Circuit court held in that case that reliance on information provided by the inside buyer in a securities transaction was unjustified because of the adversarial context in which the defendant corporation purchased the plaintiff stockholder's shares. Mergens, 166 F.3d at 1118-19. No Washington case law is cited for this proposition.
In the dispute underlying Mergens, the plaintiffs asserted that the defendants were mismanaging the corporation, alleging "a shocking waste of corporate assets" and personal profit at the expense of shareholders. Mergens, 166 F.3d at 1118. The adversarial relationship between the corporation and shareholders centered on the loss of value of the stock due to mismanagement. The parties negotiated a Stock Purchase Agreement (Agreement) to resolve their dispute. Plaintiffs' learned that the corporation had not disclosed favorable information in the negotiation, nor prior to buying back stock under the agreement. They then brought suit against the defendant corporation included claims for violations of SEC Rule 10b-5 and Florida state securities law. At issue was whether a corporation breached its duty when it failed to disclose developments within the corporation prior to its repurchase of the plaintiff shareholder's stock. Mergens, 166 F.3d at 1116.
The Agreement contained a merger clause and a general release applicable to all claims accrued as of the date of the Agreement. Mergens, 166 F.3d at 1116. The release provision stated that the defendant corporation was released from any claim the plaintiffs "ever had, now have ... shall or may have ... from the beginning of the world to the date" of the Agreement. Mergens, 166 F.3d at 1117. The Eleventh Circuit upheld the district court's grant of summary judgment in favor of the defendants. Explaining that the release provision in the Agreement was governed by contract law under Florida law, the court found that the language of the Agreement's release provision "unambiguously barr[ed] all actions premised on [the] claims that arose before, and contemporaneous to, the execution of the Agreement." Mergens, 166 F.3d at 1117. The court then found that the plaintiffs had not proven the reliance element of fraud because reliance on misrepresentations or omissions by the opposing parties negotiating a settlement agreement in the context of a contentious and adversarial relationship is unreasonable as a matter of law. Mergens, 166 F.3d at 1116. Mergens is distinguishable on several grounds.[8] First, the plaintiffs were barred *1189 from attacking the Agreement because its release clause released the defendants from any claim the plaintiffs "ever had, now have... shall or may have ... from the beginning of the world to the date" of the Agreement. Mergens, 166 F.3d at 1117. Here, in contrast, the release clause in the parties' Settlement Agreement is expressly limited to claims up to the date of the appellants' resignations from IObjects. Thus, Smith's Settlement Agreement releases claims up to October 8, 1998, and Guarino's Settlement Agreement releases claims up to October 12, 1998. The period from October 1998 to the execution of the Settlement Agreement in March 1999 was not covered by the release.
Second, unlike the Agreement at issue in Mergens, the Settlement Agreements here expressly state that they "shall not affect or impair ... the rights or obligations of the parties under this Agreement, or [appellants'] rights as a shareholder[s] of [IObjects], following October [8 or 12], 1998." Thus, the material facts which were not disclosed constitute violations of Smith's and Guarino's rights as stockholders occurring after October 1998.
Finally, even if the release and merger clauses reached as far as those in Mergens, we would reach the same result. The central dispute between Mergens and Dreyfoos was loss of stock value allegedly caused by the defendant's mismanagement. Mergens demanded Dreyfoos buy back his shares of stock. The dispute was resolved by negotiating a value for the stock and the terms of its sale back to the corporation. When negotiating the buy back price, the defendant's allegedly omitted material information that would have affected how the stock was valued. Mergens held reliance on misrepresentations or omissions was unreasonable as a matter of law between the parties negotiating a settlement agreement in the context of a contentious adversarial relationship. We do not disagree with its holding where the misrepresentations or omissions were at the heart of the issues being resolved in the adversarial relationship.
However, we do not believe the duty under the WSSA to disclose or abstain from insider transactions is extinguished merely upon showing the buyer and seller had an adversarial relationship. We do not read the Mergens holding to be so broad, and no other authority has been cited for such a proposition. Further, such a rule would be at odds with the duty to liberally construe the WSSA.
The Mergens holding makes sense where the value of the stock was at the heart of the dispute between the parties. However, here the heart of the dispute was a claim for unpaid severance benefits under a written employment agreement. That agreement contained no provision about resale of stock on termination of employment or otherwise. Appellants' made no claim of a right to sell back their stock. They made no claim for damages based on the value of the stock. We conclude that the stock was not at issue in the dispute that proceeded to mediation, *1190 let alone at the heart of the adversarial relationship between the parties.
The record shows that the respondents made one or more inquiries about the possibility of repurchasing the appellants' stock and did so prior to the time the appellants filed their claim for severance pay. Had the appellants agreed to sell at that time, there is no doubt the disclose or abstain rule would have applied. We find no basis for objecting to the inclusion of the stock transaction in the parties' Settlement Agreement. However, no authority has been cited for the proposition that parties can expressly or implicitly contract away the provisions of the WSSA. If we held that by merely combining a stock buy-sell agreement with the provisions of the settlement of their unrelated severance compensation dispute, the parties then were not bound by the disclose or abstain requirements, we would be creating a rule allowing the parties to contract away the protections of the WSSA. This we will not do.
We conclude it was not unreasonable as a matter of law for the appellants to expect that the respondents were bound to disclose or abstain in the context of their stock sale agreement. Therefore, it was not unreasonable as a matter of law for appellants to rely on the omissions made by the respondents. Since the appellants presumed reliance is not unreasonable as a matter of law, and since the presumption of reliance is unrebutted in the record, the appellants have established the right to rely on the omissions of the respondents and are entitled to damages. The trial court erred as a matter of law in concluding to the contrary.
D. Controlling Persons
Wardall and Nelson assert that because they had no knowledge of Wollach's statements to the appellants on November 18, 1998, they bear no liability for any of the appellants' claims.
RCW 21.20.430(3) states in relevant part:
Every person who directly or indirectly controls a seller or buyer liable under subsection (1) or (2) above, every partner, officer, director or person who occupies a similar status or performs a similar function of such seller or buyer, every employee of such a seller or buyer who materially aids in the transaction, and every broker-dealer, salesperson or person exempt under the provisions of RCW 21.20.040 who materially aids in the transaction is also liable jointly and severally with and to the same extent as the seller or buyer, unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable.
The respondents rely upon the discussion of "controlling persons" and the WSSA in Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir.1984) to support their contention that because they had no knowledge of Wollach's November 18, 1998 statement they bear no liability. The SEC has defined "control" to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Wardall and Nelson do not dispute that as officers and directors of IObjects they were "controlling persons" as that term is used in securities cases. Rather, they maintain that under Burgess they lacked the knowledge requisite for liability.
In Burgess, the court held that two directors of a defendant corporation who had not been directly involved in misrepresentations prior to the securities transaction at issue, and had no knowledge of the transaction, bore no liability. Burgess, 727 F.2d at 832. The court explained that, although under RCW 21.20.430(3), a controlling person could be liable on derivative liability, in that particular case, because there was no showing that the directors were active participants in the securities violations, they bore no liability for those violations. Burgess, 727 F.2d at 832-33.
Burgess is distinguishable. It is undisputed that neither Wardall nor Nelson attended the November 18 meeting. However, both Nelson and Wardall knew about the repurchase transaction. They were signatories to *1191 the Settlement Agreement confirming IObjects' repurchase of the appellants' shares. Neither Nelson nor Wardall disclosed to appellants, prior to IObjects' repurchase, information about its merger negotiations with Avatar. Nothing in the record indicates that Nelson and Wardall were precluded from inquiring of Wollach what had or had not been disclosed. Such an inquiry was within the scope of exercise of reasonable care. As officers and directors of the issuer corporation, IObjects, Nelson and Wardall therefore breached their duty to the appellants to disclose nonpublic material facts in a repurchase of the company's own shares. Accordingly, they share liability with the IObjects and Wollach for a breach of the duty to disclose under the WSSA.
E. Conclusion
IObjects, Wollach, Wardall and Nelson, as an issuer corporation and insider officers and directors, had a duty under the WSSA to disclose material, nonpublic information when negotiating its repurchase of IObjects' stock or to abstain from the transaction. In failing to disclose its merger negotiations with Avatar, they omitted material facts. Under Shermer and McCormick the appellants were entitled to rely on IObjects' representations. Wollach, Nelson, and Wardall were all signatories to the parties' Settlement Agreements, which included a securities repurchase provision, and all are liable for the breach. We reverse the trial court's conclusion that the WSSA is inapplicable, and hold that IObjects, and Wollach, Wardall, and Nelson as its officers and directors, breached the WSSA.
III. Fraud
The appellants also allege common law breaches of fraud and negligent misrepresentation.
To establish a claim for fraud, in general a plaintiff must prove the following elements: (1) representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of the truth; (5) the speaker's intent that the recipient will rely upon the fact; (6) ignorance on the part of the recipient; (7) reliance on the part of the recipient; (8) the recipient's right to rely; and (9) recipient's resulting damage as a result of his reliance. Williams v. Joslin, 65 Wash.2d 696, 697, 399 P.2d 308 (1965). Each of these elements must be proved by clear, cogent, and convincing evidence. Joslin, 65 Wash.2d at 697, 399 P.2d 308. The burden is on the plaintiff to prove the existence of all of the elements of fraud. Puget Sound Nat'l Bank v. McMahon, 53 Wash.2d 51, 54, 330 P.2d 559 (1958.)[9] The absence of any element is fatal to a claim. Puget Sound 53 Wash.2d at 54, 330 P.2d 559.
Here, the respondents omitted to disclose nonpublic material information to the appellants prior to its repurchase of their stock. The first and second elements of a fraud claim are met because, as established above, its merger negotiations with Avatar were material.
Under Shermer and Kaas v. Privette, 12 Wash.App. 142, 529 P.2d 23 (1974), the third element of a fraud claim, falsity, is fulfilled when, as here, a party with a duty to speak fails to disclose a material fact. Kaas, 12 Wash.App. at 147-49, 529 P.2d 23 (recognizing that where a material fact is known to one party but not to the other, failure to disclose is fraudulent); Shermer, 2 Wash. App. at 845, 472 P.2d 589. As officers and directors of IObjects, the respondents breached their duty to disclose material facts in negotiating the repurchase of IObjects' shares. Thus, under Shermer and Kaas, the third element of fraud is met.
The record establishes a finding that Wollach knew of IObjects' merger negotiations with Avatar. It is also clear that Nelson and Wardall were present at IObjects' January 7, 1999 Board meeting, the minutes for which *1192 indicate that a merger with Avatar was contemplated at the meeting. We therefore conclude that the appellants have met their burden of showing that all of the respondents had knowledge of the IObjects' Avatar merger negotiations. Thus, they meet the fourth element of a fraud claim, the speaker's knowledge of the truth.
The fifth element of fraud, the speaker's intent that the recipient rely, is also met. Wollach solicited on behalf of IObjects the repurchase of the appellants' stock. The respondents do not deny that IObjects' acquisition of the appellants' stock was critical to their merger and acquisition plans. The appellants inquired into the status of the corporation at their November 18, 1998 meeting with Wollach. Their inquiry was a clear indication that their resale decision would be influenced by their estimation of IObjects' financial condition. Their inquiry also put the respondents on notice that changes in the corporation's fortunes were material to the appellants. The respondents therefore knew of the appellants' reliance upon material omissions. The sixth element of fraud, the speaker's intent that the recipient will rely, is thus satisfied.
The respondents contend that the reliance element of a fraud claim is not met. As discussed above, where an issuer corporation fails to disclose material, nonpublic facts in its repurchase of shares, there is a rebuttable presumption that the shareholder is entitled to rely. Morris, 107 Wash.2d at 328, 729 P.2d 33. Because the respondents failed to rebut that presumption, the appellants as shareholders were entitled to rely. Accordingly, the appellants meet the reliance element of a fraud claim.
The elements of fraud have been established. However, the trial court did not address whether the appellants had sustained damages because of IObjects' failure to disclose its merger negotiations with Avatar. The damages element of fraud therefore remains a question of fact to be addressed by the trial court upon remand.
IV. Fiduciary Duty
Smith and Guarino also assign error to the trial court's conclusion that the respondents did not owe them a fiduciary duty.
The trial court concluded that because the appellants and respondents were "adversaries involved in a negotiation process to try [and] resolve various competing interests and claims," the respondents owed no fiduciary duty to the appellants.
Because all of the elements of a WSSA claim were met, the respondents owed a special fiduciary duty under the WSSA. Shermer, 2 Wash.App. at 850, 472 P.2d 589; McCormick, 26 F.3d at 876. The parties' Agreement preserved the appellants' claims as shareholders. As discussed above, this duty was not extinguished by combining the stock transfer with the settlement of the contractual compensation claim.
The question here is whether the respondents also owed the appellants a fiduciary duty outside of the WSSA. Washington courts have characterized a fiduciary relationship as one which:
imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. "The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not on his own behalf, but in the interests of the other party."
Goodyear Tire & Rubber Company v. Whiteman Tire, Inc., 86 Wash.App. 732, 741-42, 935 P.2d 628 (1997) (internal citations omitted). The parties' relationship in this case cannot be characterized as one built on a foundation of trust. The record illustrates that even prior to their resignations, the appellants were cognizant that the respondents did not have their best interests in mind. Smith testified at trial about the rapid deterioration of his relationship with the respondents and that he believed that they were conducting closed-door meetings in the final days of his tenure at IObjects. He acknowledged that he looked upon Wardall and Nelson as enemies, and accused Wardall of being a traitor and trying to steal the company. The animosity between the appellants and respondents did not subside once *1193 the appellants resigned. To the contrary, the appellants felt compelled to hire an attorney because IObjects refused to honor their severance packages. The parties' adversarial relationship continued through mediation of their employment claims and the execution of their Settlement Agreements. As in Mergens, the adversarial nature of the parties' in relation to the employment claims' dispute extinguished the common law fiduciary duty that existed between employee and employer and among the parties as officers and directors. Nonetheless, this did not extinguish the special duty owed under the WSSA when insiders seek to buy back stock. The appellants' common law fiduciary duty claim is independent of the WSSA claim. The trial court did not err in concluding that the respondents owed no fiduciary duty to the appellants independent of the WSSA.
V. Negligent Misrepresentation
The appellants also allege that the trial court erred in dismissing their claim for negligent misrepresentation.
Washington has adopted the Restatement (Second) of Torts sections 551 and 552 (1977) as the standard for claims of negligent misrepresentation. Richland Sch. Dist. v. Mabton Sch. Dist., 111 Wash.App. 377, 385, 45 P.3d 580 (2002) (citing Havens v. C & D Plastics, Inc., 124 Wash.2d 158, 180, 876 P.2d 435 (1994)).
In order to sustain a claim under these sections, the plaintiff must establish, in part, a duty to disclose or to provide accurate information. Liability for failure to disclose is set out in section 551:
(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them and
(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading[.]
Restatement (Second) of Torts Section 551 (1977).
Richland Sch. Dist., 111 Wash.App. at 385-86, 45 P.3d 580. The duty to disclose arises in a quasi-fiduciary relationship, when "(1) a special relationship of trust and confidence exists between the parties; (2) one party relies upon the superior specialized knowledge and experience of the other; (3) the seller has knowledge of a material fact unknown to the buyer; and (4) there exists a statutory duty to disclose." Richland Sch. Dist., 111 Wash.App. at 386, 45 P.3d 580 (citing Colonial Imports v. Carlton N.W., Inc., 121 Wash.2d 726, 732, 853 P.2d 913 (1993)).
The first element of a negligent misrepresentation claim is met because under the WSSA the appellants were entitled to rely upon the respondents' representations. Morris, 107 Wash.2d at 328, 729 P.2d 33. The record shows that the appellants did not have knowledge of IObjects' merger negotiations with Avatar prior to signing the Settlement Agreement; thus, the respondents had knowledge not held by the appellants, fulfilling the second and third elements of a negligent misrepresentation claim. Causation flows from the respondents' failure to disclose a material fact under its duty to disclose and the appellants' right to rely on that duty. As discussed above, the adversarial nature of the parties in relation to their employment claims dispute extinguished the respondents' common law fiduciary duty, but the appellants were owed a statutory duty to disclose under the WSSA. Thus, the fourth element of a negligent misrepresentation claim is met. The claim for negligent misrepresentation was proved. Accordingly, we conclude that the trial court erred in dismissing the appellants' claim for negligent misrepresentation.
*1194 VI. Damages
The trial court entered no Findings of Fact or Conclusions of Law regarding the proper measure for damages in this case.
The remedy for securities violations under the WSSA are specified in RCW 21.20.430(2):
Any person who buys a security in violation of the provisions of RCW 21.20.010 is liable to the person selling the security to him or her, who may sue either at law or in equity to recover the security, together with any income received on the security, upon tender of the consideration received, costs, and reasonable attorneys' fees, or if the security cannot be recovered, for damages. Damages are the value of the security when the buyer disposed of it, and any income received on the security, less the consideration received for the security, plus interest at eight percent per annum from the date of disposition, costs, and reasonable attorneys' fees.
Relying upon Windswept Corp. v. Fisher, 683 F.Supp. 233 (W.D.Wash.1988), the respondents assert that the appellants are precluded from seeking damages because they failed to tender back the money they received for their shares. Windswept is not controlling. Windswept states that under RCW 21.20.430(1), a defrauded buyer is obligated to return stock to a seller prior to receiving damages. Windswept, 683 F.Supp. 233. However, by contrast, under RCW 21.20.430(2), rescission is not a defrauded seller's exclusive remedy. The statute applicable to sellers expressly provides for damages. A defrauded seller's tender of cash is required only where rescission is possible. Whether rescission is possible requires a factual determination by the trial court that the securities in question are available. No such determination was made here.
In this case, the appellants have requested damages. Under RCW 21.20.430(2), the measure for damages is IObjects' selling price and any income received from the appellants' stock, less the consideration received by the appellants for the stock, plus interest at 8 percent per annum from the date of disposition of the stock, costs and reasonable attorney fees. We remand to the trial court to determine damages consistent with RCW 21.20.430(2).
VII. Attorney Fees
Paragraph 16 of the parties' Settlement Agreements provides that fees and costs be awarded to the prevailing party. If the appellants prevail on remand they are thus entitled to recover attorney fees and costs incurred at trial and on this appeal. On remand, the trial court shall enter the proper award of attorney fees.
Reversed and remanded in part and affirmed in part.
WE CONCUR: COX, A.C.J., and COLEMAN, J.
NOTES
[1] A "burn rate" refers to the amount of cash a company expends relative to its income. The record reflects that IObjects' "burn rate" was approximately $300,000 per month when Smith and Guarino were still employed by IObjects. At some point after their departure from IObjects, the "burn rate" was reduced to approximately $200,000 per month.
[2] No party recalls the exact amount of the offer, but they agree that Wollach offered the appellants about $.20 per share. The appellants refused the offer. Wollach testified, as did Holtan, that Wollach was not authorized by IObjects to make any offer to them at the November 18, 1998 meeting. Guarino recalls that Nelson made a similar offer on the phone to him prior to the November 18, 1998 meeting.
[3] The parties disagree as to the validity of the appellants' severance packages. Smith testified that following his announcement that he would step down as CEO of IObjects, a compensation committee made recommendations to the Board for a salary increase and severance package for him. The record supports Smith's testimony that IObjects' Board voted to approve both the salary increase and the severance benefits package on June 25, 1998. According to Smith, Guarino also received a salary increase and severance package. On July 1, 1998, Smith, as CEO, signed the amendment to Guarino's January 1, 1998 Compensation Agreement. Also on July 1, 1998, Wollach, as CFO and Treasurer, signed the amendment to Smith's January 1, 1998 Compensation Agreement. The 10b-5 report filed with the SEC in August 1998 also states that, per Amended Compensation Agreements, Wollach, Smith and Guarino were to receive one year's salary upon termination for any reason other than fraud.

Wollach testified that no actual amendments to the appellants' employment agreements were drafted at the June 25, 1998 Board meeting. He also testified that although he had signed the July 1, 1998 amended employment agreements, neither Nelson nor Wardall had seen or signed the documents.
Smith testified that at the Board meeting at which he resigned, Board members stated that the appellants' severance packages would be rejected because if the company honored them European investors would sue the appellants, IObjects, and its directors and officers.
[4] On April 19, 1999, IObjects' shares closed at slightly over $2 per share. On April 27, 1999, it closed at slightly over $3.50 per share. The value then fluctuates, dropping to as low as $1 per share at closing on October 26, 1999, but also climbing to $9,688 per share on February 23, 2000.
[5] 17 C.F.R. 240.10b-5, the relevant federal securities fraud statute states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
[6] McCormick is similar to this case in that there, as here, a former executive negotiated with the defendant corporation for the repurchase of his stock alleged that the corporation breached its duty to disclose material information regarding the company's future plans. In McCormick, a Ninth Circuit case, the appellant, McCormick, was a former CEO of a company that was a wholly-owned subsidiary of the defendant corporation. 26 F.3d at 872. After resigning, the defendant corporation proposed that McCormick sell his 500,000 shares of stock to the defendant. 26 F.3d at 872. At the time, the corporation was engaged in merger discussions with a foreign corporation. 26 F.3d at 874. The defendant did not disclose the merger discussions to McCormick at the time of their settlement negotiations. 26 F.3d at 872. McCormick signed a buy-out agreeing to let the company repurchase his shares for several dollars above their market value. 26 F.3d at 872. The officers and directors of the defendant corporation were to present the agreement to its Board the following day for approval. 26 F.3d at 873. Prior to that Board meeting, however, members of the Board decided to meet with McCormick in order to disclose that the corporation was about to commence preliminary merger negotiations with a company. 26 F.3d at 874. They informed McCormick that the value of stock could rise if the merger materialized. 26 F.3d at 874. The parties then signed an Acknowledgement that McCormick had been "fully and adequately informed" of the merger possibility. 26 F.3d at 874. McCormick later sued the defendants, alleging violations of federal and state securities laws, breach of fiduciary duty, fraud and other claims. 26 F.3d at 875. He based his claims on several alleged omissions and misrepresentations in the Acknowledgement. 26 F.3d at 874. Although the court ultimately affirmed the district court's summary judgment dismissing McCormick's claims on the grounds that the defendants' misrepresentations and omissions were not material, it first established that the defendants had a duty to disclose. 26 F.3d at 874. As the corporate issuer of the stock in possession of nonpublic information, the court found, the defendant "must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them." McCormick, 26 F.3d at 876.
[7] IObjects had a letter of intent, dated November 6, 1998, with Dart Communications (Dart). Wollach did not disclose Dart's name at the November 18, 1998 meeting because of a nondisclosure agreement IObjects had with Dart.
[8] The respondents also rely upon Pettinelli v. Danzig, 722 F.2d 706, 709 (11th Cir.1984) and Jankovich v. Bowen, 844 F.Supp. 743 (S.D.Fla. 1994), for the proposition that an adversarial relationship bars reliance. Mergens and Jankovich both relied on Pettinelli to support the position that an adversarial relationship bars justified reliance in securities fraud cases.

Pettinelli was a stockholder's derivative suit arising out of the formation and capitalization of a land development corporation. Pettinelli, 722 F.2d 706. In Pettinelli, the defendants persuaded the plaintiffs to invest in the corporation, promising them a substantial percentage of the corporations' stock in the future. Pettinelli, 722 F.2d at 708. When the corporation never issued the stock, the plaintiffs originally threatened to bring suit, but thereafter agreed to negotiate a Settlement Agreement in lieu of a suit. Pettinelli, 722 F.2d at 707-08. The Agreement contained a release provision stating that the Agreement settled all claims between the parties prior to that date. Pettinelli, 722 F.2d at 707-08. The plaintiffs later brought suit, alleging that the defendant corporation had fraudulently induced them to invest in the corporation and to enter the Agreement. Pettinelli, 722 F.2d at 707. The Eleventh Circuit found that the release clause barred the plaintiffs' claims and also that the parties' adversarial relationship made their reliance unjustified. Pettinelli, 722 F.2d at 710
In Jankovich, the plaintiffs/stockholders and defendant corporation executed a Settlement and Release Agreement ("Agreement") following disputes over the transfer of stock. Jankovich, 844 F.Supp. at 745. The Agreement's merger and release provision stated, "this Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and replaces and supersedes any prior or contemporaneous oral or written representations, agreements or understandings." Jankovich, 844 F.Supp. at 747. The plaintiffs argued that nonetheless, the defendants fraudulently induced them to enter into a stock buyback Agreement by "deliberately making false representations regarding the registration" of the stock. Jankovich, 844 F.Supp. at 747. Relying on Pettinelli, the district court found that even if the plaintiffs had been able to prove the existence of misrepresentations, their "claim for fraudulent inducement must be extinguished because [the] parties to an adversarial relationship ... cannot justifiably claim that they relied on alleged misrepresentations. Jankovich, 844 F.Supp. at 748.
Thus, Pettinelli and Jankovich are both distinguishable on the same grounds as Mergens. In neither case did the Agreement protect the plaintiff appellants' shareholder rights. Also, the underlying dispute differed: the securities transactions in Pettinelli and Jankovich were part of the underlying dispute leading to the Agreements at issue; and finally, in contrast to the release provision in the Agreement at issue here, the release provisions in the Pettinelli and Jankovich Agreements expressly barred all claims arising up to the date of the Agreements.
[9] "The trier of fact is justified in finding that the representee did not have the right to rely on a representation, if made, if the representee had expert knowledge of the general subject matter and was peculiarly fitted and qualified, by knowledge and experience, to evaluate that which he [sees] and appreciate the obvious falsity of the claimed representation." Puget Sound, 53 Wash.2d at 54, 330 P.2d 559; Joslin, 65 Wash.2d at 698, 399 P.2d 308 (1965) (A representee has a duty to use due diligence and investigate representations before his reliance is justified.).