FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re: SILVER LAKE GROUP, LLC SECURITIES LITIGATION, | No. 23-15822 |
| | D.C. No. 4:20-cv-02341-JSW |
| WALLEYE OPPORTUNITIES MASTER FUND LTD.; WALLEYE MANAGER OPPORTUNITIES LLC, Lead Plaintiffs, | OPINION |
| *Plaintiffs-Appellants*, | |
| v. | |
| SILVER LAKE GROUP, L.L.C.; SLP III INVESTMENT HOLDINGS S.A R.L.; SILVER LAKE PARTNERS III, L.P.; SILVER LAKE TECHNOLOGY INVESTORS III, L.P.; SILVER LAKE TECHNOLOGY ASSOCIATES III, L.P.; SLTA III (GP), L.L.C.; BC PARTNERS LLP; SERAFINA S.A.; BC EUROPEAN CAPITAL VIII; BC EUROPEAN CAPITAL-INTELSAT CO-INVESTMENT; BC EUROPEAN CAPITAL-INTELSAT CO-INVESTMENT 1; CIE MANAGEMENT II LIMITED; | |

LMBO EUROPE SAS; RAYMOND
SVIDER; JUSTIN BATEMAN;
DAVID MCGLADE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted April 5, 2024
San Francisco, California

Filed July 24, 2024

Before:  MILAN D. SMITH, JR., ANDREW D.
HURWITZ, and ANTHONY D. JOHNSTONE, Circuit
Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY[*]

## Securities

The panel affirmed the district court's dismissal of an action under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

Hedge funds Walleye Opportunities Master Fund Ltd. and Walleye Manager Opportunities LLC sued large shareholders of Intelsat S.A., alleging that the shareholders acquired material non-public information surrounding a meeting between Intelsat and the Federal Communications Commission and that the shareholders relied upon this information in insider trading during an after-hours block sale of stock.

The panel held that Walleye had Article III standing to sue because it sufficiently pleaded both injury and causation by alleging that it bought Intelsat stock at a price inflated due to defendants' failure to disclose material information.

The panel held that Walleye had statutory standing under Section 20A of the Exchange Act, which requires that plaintiff-buyers trade "contemporaneously" with defendant-sellers, even though Walleye traded on the public market and did not buy the Intelsat shares sold during the after-hours block trade.

The panel held, however, that Walleye failed adequately to plead that the BC Partners defendants, the Silver Lake defendants, and defendant David McGlade possessed

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

material non-public information. Walleye did not adequately plead that Silver Lake knew about the meeting with the FCC because it did not specifically allege the who, what, when, where, or how Silver Lake learned of the meeting prior to selling Intelsat shares. Walleye did not adequately plead that BC Partners knew about the meeting prior to its trade because Walleye did not allege with particularity any communications between Intelsat and BC Partners. And for similar reasons, Walleye did not adequately plead that McGlade possessed material non-public information.

The panel held that Walleye also failed adequately to plead that the alleged information that the defendants had was material.

---

### COUNSEL

Jake Bissell-Linsk (argued), David Saldamando, and Carol C. Villegas, Labaton Keller Sucharow LLP, New York, New York; for Plaintiffs-Appellants.

Gerson A. Zweifach (argued), Steven Farina, and Amanda M. MacDonald, Williams & Connolly LLP, Washington, D.C.; Melanie Blunschi (argued), Nicholas Rosellini, and Morgan E. Whitworth, Latham & Watkins LLP, San Francisco, California; Christina R. Gay, Latham & Watkins LLP, Washington, D.C.; Matthew Rawlinson, Latham & Watkins LLP, Menlo Park, California; Evan L. Seite (argued) and Nina F. Locker, Wilson Sonsini Goodrich & Rosati, Palo Alto, California; Steffen N. Johnson and John B. Kenney, Wilson Sonsini Goodrich & Rosati, Washington, D.C.; Miles F. Ehrlich and Katharine A. Kates, Ehrlich & Craig, Berkeley, California; for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Hedge funds Walleye Opportunities Master Fund Ltd. and Walleye Manager Opportunities LLC (collectively, Walleye) sued three large shareholders of Intelsat S.A. (Intelsat), a satellite communications company. They alleged that the defendant shareholders—BC Partners, Silver Lake, and David McGlade, chairman of Intelsat's board[1]— acquired material non-public information surrounding a meeting between Intelsat and the Federal Communications Commission (FCC) that the shareholders relied upon in insider trading during an after-hours block sale of stock. The shareholders separately moved to dismiss the complaint. The district court granted the motions, holding that Walleye failed to adequately plead both possession of material non-public information and scienter. Walleye amended the complaint, adding minimal allegations, but the district court dismissed the operative second amended complaint (SAC) on similar grounds. We affirm.

---

[1] In its operative second amended complaint (SAC), Walleye sued sixteen defendants. Reference to "BC Partners" in this opinion refers to all the named "BC Partners" defendants represented on appeal, as defined in the SAC, as well as individual defendants Raymond Svider and Justin Bateman. Similarly, "Silver Lake" refers to any "Silver Lake" defendants represented on appeal, as defined in the SAC.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Factual Background

#### A.  Intelsat advocated for a market-based approach to selling its C-Band license, which led to increasing public opposition.

Intelsat is a satellite operator that provides broadcasting services.[2]  To avoid service issues caused by multiple broadcasts transmitting over a single frequency, the FCC allocates licenses for use of individual frequencies.  A significant portion of Intelsat's business involved its license to use the frequency range known as the "C-Band," which is often used for television broadcasts.

By 2017, discussions began among interested parties about options for "freeing up" the C-Band to aid in the adoption of 5G technology.  To avoid a financial catastrophe from the possible loss of its C-Band license, Intelsat formed the "C-Band Alliance" (CBA) with other satellite broadcasters.  The CBA proposed that its members voluntarily vacate the C-Band and then auction the right to use the vacated portion of the spectrum to cell phone service providers.  This proposal, a "private auction," would compensate CBA members for freeing up the C-Band with the profits from the auction.  It was assumed that such an auction would yield more than $60 billion.

The FCC, however, traditionally used a "public auction" to allocate spectrum bands.  If the FCC were to sell C-Band rights at a public auction, it would begin by revoking the CBA members' licenses and their rights in the C-Band.  The

---

[2] Unless otherwise noted, we recount the facts from the SAC and assume them to be true.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

FCC would then auction the rights to new licensees to use the C-Band with the federal government receiving the auction proceeds. Without the benefit of proceeds from a private auction of C-Band rights, Intelsat likely could not service its debts and would eventually be compelled to file for bankruptcy.

Whether the FCC would pursue a public or private auction of the C-Band rights depended on the vote of FCC Chairman Ajit Pai. According to a confidential witness, a vice-president-level former employee of Intelsat (Confidential Witness One), by the fall of 2019, the FCC "had been giving Intelsat 'all the right body language' to indicate it was likely to support" a private auction. Between September and October of 2019, analysts at various investment banking firms publicly opined that the FCC appeared likely to permit the CBA to engage in a private auction.

In late October of 2019, the tides began turning against a private auction. Senator John Kennedy, a particularly vocal opponent of a private auction, advocated to Chairman Pai and President Trump for a public auction.[3] In the House of

---

[3] The statements in this paragraph come from news articles and a congressional press release BC Partners attached to its motion to dismiss. The district court took judicial notice of the existence of these documents to establish public knowledge of legislation and statements opposing the private auction. *See In re Silverlake Grp., L.L.C. Secs. Litig.*, No. 20-cv-02341, 2022 WL 4485815, at \*3 & nn. 5–7 (N.D. Cal. Sept. 27, 2022). Walleye does not oppose our consideration of these exhibits, and we consider them as information "not subject to reasonable dispute." Fed. R. Evid. 201(b); *see Tellabs*, 551 U.S. at 322 (noting that court may consider judicially noticed documents in deciding a Federal Rule of Civil Procedure 12(b)(6) appeal); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

Representatives, a bipartisan group of lawmakers introduced a bill that would require a public auction. Reports in early November confirmed that there was "mounting pressure from both Republicans and Democrats" for the FCC to reject the CBA's public auction plan.

### B. Intelsat and CBA representatives met with the FCC on November 5, 2019.

On the evening of November 4, 2019, Intelsat and CBA representatives requested a meeting with FCC staff for the next morning. Public records show that meetings between the CBA and FCC had occurred more than 50 times between 2018 and 2019.[4] A meeting was scheduled at the FCC offices in Washington, D.C. at 9:00 AM on November 5, 2019. Intelsat CEO Spengler, Stephen Collar, the CEO of SES (another major member of the CBA), other CBA representatives, and Nicholas Degani, senior counsel to Chairman Pai, attended the meeting. Prior to the meeting, Degani emailed Chairman Pai and said, "so . . . given where we are, I assume I'd play it cold, no?" Chairman Pai agreed.

What occurred at the meeting is not entirely clear. Confidential Witness One, who was not in attendance, said that "he was informed, just after the meeting, that the meeting had 'confirmed the rumors that the FCC was leaning toward going with Senator Kennedy's approach,' but that 'the fight was not over,' because it may still be possible to win them over." Confidential Witness Two, a senior executive at the CBA, also did not attend the meeting but

---

[4] We take judicial notice of this document, which is publicly available on the FCC website, for the proposition that the information available to the public included regular FCC-Intelsat meetings. *See Tellabs*, 551 U.S. at 322; *Khoja*, 899 F.3d at 999.

heard that the "meeting had gone poorly and that the messaging from the FCC was negative."

SES CEO Collar, testifying at a subsequent bankruptcy trial,[5] stated that the meeting departed from the usual course of meetings between CBA and the FCC.   Collar testified that:

> We'd been engaged [for more than eighteen months] with the FCC.  We'd had a number of meetings with Nick Degani, who was kind of running the process, I would say. . . . And normally what happened in meetings with Nick Degani is he would pretty much tell us how it was.  So he would explain the position of the chairman.  He would explain how we should think about things.  He would tell us – you know, give us direction.  In this meeting, he didn't.  He was very – very quiet.  He responded only to a handful of questions.  And he gave us reason to believe that the plan we had, which was for a – a private auction, would – was at risk.

Collar continued that, after the meeting, the attendees "all formed slightly different impressions" about how they believed the FCC process would unfold.   "[O]ne interpretation of what [Degani] said was that" the White

---

[5] We may consider "documents incorporated into the complaint by reference." *Tellabs*, 551 U.S. at 322.  A complaint incorporates a document by reference "'if the plaintiff refers extensively to the document.'" *Khoja*, 899 F.3d at 1002 (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).  Walleye extensively quotes bankruptcy testimony throughout the SAC. *See id.*

House did not support a private auction and that CBA was "running into political objection."

Spengler testified at the bankruptcy trial that the attendees "didn't know" whether "the tide seemed to be turning," but that the tone of the meeting was different than prior meetings. Spengler confirmed that Degani was "tight-lipped" at the meeting and "[d]idn't respond clearly to [] questions." Although he was worried that the FCC was going to reject a private auction approach, "it was not definitive in [Spengler's] mind." He viewed Degani as offering "virtually no feedback on any of the points [the CBA] made" and no "additional information as to where the FCC stood in their process."

After the meeting, the attendees returned to a hotel, where they engaged in "a lot of discussion" in order "to figure out how much trouble [they] were in," and whether Degani was trying to send a message to them that they did not have political support for a deal.

### C. Intelsat's biggest investors sold shares after the market closed on November 5, 2019.

Intelsat's largest shareholders at the time of the meeting included two private equity firms: BC Partners, which owned about 41% of Intelsat, and Silver Lake, which owned about 9%. BC Partners was represented on the board of directors, but Silver Lake was not.

After the markets closed on November 5, 2019, Morgan Stanley brokered a private block trade of Intelsat stock on behalf of BC Partners, Silver Lake, and McGlade, chairman of Intelsat's board. BC Partners initiated the trade, while Silver Lake and McGlade exercised their "tag-along" rights to participate in any equity sale initiated by BC Partners.

The selling group offered 10 million shares (about 14% of the group's holdings) at $24.60 per share, a 6.6% discount to the market closing price.   Interested buyers had an hour to decide whether to accept the offer.  Walleye does not allege that it purchased any shares in the block sale.

In subsequent bankruptcy testimony, Intelsat's general counsel testified that "BC Partners had been planning [its] trade before the November 5 Meeting."  *In re Intelsat S.A.*, No. 20-bk-32299, at *27–28 (Bankr. E.D. Va. Nov. 30, 2021), Dkt. 3662.   She recounted conversations with employees of BC Partners on November 1 and 4 about the firm's "intention to trade" "once the trading window opened after [Intelsat's] quarterly earnings release" on October 29, 2019.[6]

### D.  Intelsat's stock collapsed.

On November 8, 2019, the FCC publicly disclosed that its staff met with the CBA on November 5 and that the CBA submitted an amended proposal to the FCC in response to a request to clear more spectrum.   Intelsat's stock price promptly dropped by 1.85%.  The next week, the CBA filed a document with the FCC reiterating its proposal to make a significant monetary contribution to the U.S. Treasury if the FCC accepted its private auction proposal.  During this time, industry analysts reported on the "decreased likelihood of the C-Band getting a clear win from the FCC" due to mounting political pressure.

On November 18, 2019, Chairman Pai announced that he would vote in favor of a public auction.  Intelsat's stock closed around 40% below the price of the prior day, a 70%

---

[6] BC Partners could not trade prior to the earnings announcement.

decline from November 5, 2019.  It fell an additional 24.16% the following day.

On February 28, 2020, the FCC formally voted 3-2 for a public auction.  Several months later, Intelsat filed for bankruptcy.  In the bankruptcy proceedings, a special litigation committee concluded, after investigating potential securities fraud claims, that there was no evidence to substantiate insider trading claims against BC Partners, Silver Lake, or McGlade.  *In re Intelsat S.A.*, No. 20-bk-32299, at *40 (Bankr. E.D. Va. Dec. 7, 2021), Dkt. 3757.

## II.  Procedural Background

The complaint in this putative securities class action was filed on April 7, 2020.  On December 1, 2020, the district court appointed Walleye as lead plaintiff pursuant to the Private Securities Litigation Reform Act of 2005 (PSLRA), 15 U.S.C. § 78u-4(a)(3)(B).  Walleye filed a first amended complaint on January 14, 2021, asserting claims under Sections 10(b), 20(a), and 20A of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1 (the Exchange Act) and Securities and Exchange Commission (SEC) Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5.

The district court granted the motions to dismiss the amended complaint of Silver Lake, BC Partners, and McGlade, holding that Walleye failed to plead particularized facts showing that the defendants were aware of material, non-public information regarding the C-Band auction at the time of their after-hours block trade.  *In re Silverlake*, 2022 WL 4485815, at *9–10.  The district court also held that Walleye failed to allege sufficient facts showing defendants acted with scienter, noting that the timing of the block sale followed Intelsat's earnings announcement for third-quarter

2019, after a selling ban lifted, during a period of intense political opposition to the private auction proposal. *Id.* The district court, however, rejected defendants' arguments that Walleye lacked statutory standing to pursue its claims. *Id.* at *5–6.

Walleye then filed the operative SAC, adding allegations from a third confidential witness, additional testimony from Intelsat's bankruptcy proceedings about the November 5, 2019, meeting, and information about Intelsat's board meeting on November 14, 2019. The defendants again each moved to dismiss for failure to state a claim, and the district court granted those motions. Walleye timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) de novo. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1105 (9th Cir. 2021).

## ANALYSIS

### I. Walleye has standing to sue.

#### A. Article III Standing

When lack of standing is raised in a motion to dismiss, we "accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party." *Levine v. Vilsack*, 587 F.3d 986, 991 (9th Cir. 2009) (cleaned up). To have constitutional standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury

likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "For standing purposes, . . . an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–27 (2021). Only a plaintiff who has "been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 427 (emphasis removed).

We conclude that Walleye sufficiently pleaded both injury and causation. Assuming the allegations in the complaint are true (and constitute insider trading), Walleye bought Intelsat stock at a price inflated because of the defendants' failure to disclose material information. One trading while in possession of material, non-public information has a duty to publicly disclose that information. *See McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 876 (9th Cir. 1994). Others who trade on the security without that information are harmed because they operate at a disadvantage, unknowingly trading a security at a price that does not reflect all information available. *See United States v. O'Hagan*, 521 U.S. 642, 651–52 (1997); *see also Shapiro v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 237 (2d Cir. 1974) ("[O]ur 'disclose or abstain' rule enunciated in Texas Gulf 'applies whether the securities are traded on a public stock exchange or sold through private placement.'" (quoting *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 887 (2d Cir. 1972))). If the allegations in the SAC constitute insider trading, Walleye was "concretely harmed by a defendant's statutory

violation" and has Article III standing to bring its insider trading claims. *TransUnion LLC*, 594 U.S. at 427 (emphasis removed).

## B. Statutory Standing

BC Partners and McGlade also claim that Walleye lacks statutory standing under Section 20A of the Exchange Act. *See* 15 U.S.C. § 78t-1(a). They argue that Walleye does not meet the statutory requirement that plaintiff-buyers trade "contemporaneously" with defendant-sellers because Walleye traded on the public market and did not buy the shares of Intelsat stock sold during the after-hours private block trade.[7] We disagree.

Section 20A provides that "[a]ny person who . . . sell[s] a security while in possession of material, nonpublic information shall be liable in an action in any court of competition jurisdiction to *any person* who*, contemporaneously with the . . . sale of securities that is the subject of such violation*, *has purchased . . . securities of the same class*." 15 U.S.C. § 78t-1(a) (emphasis added). The word "contemporaneous" denotes a temporal proximity and means "existing, occurring, or originating during the same time." *Contemporaneous*, Merriam-Webster.com Dictionary Online (2024); *Turocy v. El Pollo Loco Holdings, Inc.*, No. 8:15-cv-01343, 2018 WL 3343493, at \*14 (C.D.

---

[7] Because we addressed statutory standing as a "threshold issue" in *East Bay Sanctuary Covenant v. Trump*, we also do so here. 932 F.3d 742, 763 (9th Cir. 2018) ("We likewise must determine whether a plaintiff's claim falls within the statute's zone of interests before we can consider the merits of the claim."). As we acknowledged, however, the "zone of interests inquiry is not jurisdictional." *Id.* at 762 n.5; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).

Cal. July 3, 2013).[8]  Appellees sold securities on November 5, 2019.  On November 5 and 6, 2019, Walleye "purchased . . . securities of the same class."  15 U.S.C. § 78t-1(a).  Thus, Walleye traded "contemporaneously" in "securities of the same class" with BC Partners, Silver Lake, and McGlade.

BC Partners and McGlade nonetheless argue that because the block sale occurred after-hours on a private-market basis, Walleye's public-market trade was not "contemporaneous."  In other words, they ask us to hold that Section 20A, although silent on the issue, requires contractual privity.  They cite several cases that describe the purpose of the contemporaneous trade rule as weeding out plaintiffs who could not have possibly traded with the insider.  *See, e.g.*, *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1002 (9th Cir. 2002); *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993); *Wilson v. Comtech Telecom. Corp.*, 648 F.2d 88, 94–95 (2d Cir. 1981) ("Any duty of disclosure is owed only to those investors trading contemporaneously with the insider; non-contemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information.").

These cases, however, address a different issue than the one BC Partners and McGlade pose.  They ask what length of time (e.g., days, weeks, or months) between transactions constitutes "contemporaneous" trading.  *Brody*, 280 F.3d at 1002; *Neubronner*, 6 F.3d at 670; *Wilson*, 648 F.2d at 94–

---

[8] Because the parties do not dispute whether trading must have occurred on the same day to be "contemporaneous," we do not decide the issue. We also assume that any trades on November 5 took place after Appellees sold their securities.

95.  None of these cases holds that trades must occur in the same market to be "contemporaneous."  Instead, they use a *purpose* behind the contemporaneous trading requirement— weeding out individuals who could not have possibly traded with the sellers—to define its temporal scope.  As the district court correctly noted, the contemporaneous trading rule is "a proxy for contractual privity."  *In re Silverlake*, 2022 WL 4485815 at *6.

In *Shapiro*, the Second Circuit noted that the "disclose or abstain" rule (i.e., prohibition on insider trading):

> applies *whether the securities are traded on a public stock exchange or sold through private placement*.  To hold that Section 10(b) and Rule 10b-5 impose a duty to disclose material inside information *only in face-to-face transactions or to the actual purchasers or sellers on an anonymous public stock exchange, would be to frustrate a major purpose of the antifraud provisions* of the securities laws: to insure (sic) the integrity and efficiency of the securities markets.

495 F.2d at 237 (cleaned up) (emphasis added).  Congress's citation to *Shapiro* in the relevant legislative history underscores that it did not intend to limit liability to transactions with direct privity.  H.R. Rep. No. 100-910, at 27 n.22 (1988).  Although the contemporaneous trading rule acts as a stand-in for privity, it merely requires that the seller and buyer engaged in transactions close in time, not with each other.  We therefore conclude that Walleye has statutory standing to sue.

## II. Walleye did not adequately plead that BC Partners, Silver Lake, and McGlade possessed material non-public information.[9]

"To recover damages for violations of section 10(b) and Rule 10b–5, a plaintiff must prove '(1) a material . . . omission by the defendant; (2) scienter; (3) a connection between the . . . omission and the purchase or sale of a security; (4) reliance upon the . . . omission; (5) economic loss; and (6) loss causation.'" *Halliburton Co. v. Erica P. John Fund*, *Inc.*, 573 U.S. 258, 267 (2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460–61 (2013)). In the insider trading context, a plaintiff must show that a defendant purchased or sold securities while possessing material, non-public information, and that the defendant acted with scienter.[10] *See United States v. Smith*, 155 F.3d 1051, 1063–64, 68 (9th Cir. 1998).

Insider trading actions "must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the . . . PSLRA." *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or

---

[9] Appellees argue that Walleye waived its argument regarding the possession of material, non-public information by not addressing it in its opening brief. Although Walleye did not frame its argument as addressing a separate element, it made several arguments that Appellees possessed material non-public information. We thus conclude that it did not waive the argument.

[10] McGlade contends that Walleye must show that the traders "used" material, nonpublic information. Because we hold that the district court properly found that Walleye did not plead possession or awareness of material, non-public information, we do not reach this issue or the issue of scienter.

mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Id.* "A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud," including "such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity," so that the "defendant can prepare an adequate answer from the allegations." *Neubronner*, 6 F.3d at 671–72 (cleaned up).

Under the PSLRA, securities plaintiffs must "state with particularity" both "facts giving rise to a strong inference that the defendant acted with the required state of mind" and "all facts on which [a] belief [related to the existence of a material omission] is formed." 15 U.S.C. § 78u–4(b)(1), (2).

To plead possession, a plaintiff must "allege specifically what information [a defendant] obtained, when and from whom he obtained it, and how he used it for his own advantage." *Neubronner*, 6 F.3d at 672. Otherwise, a defendant could not "respond to the complaint other than by generally denying that he ever obtained any material, adverse nonpublic information . . . which he then used to trade . . . securities for his own benefit." *Id.*

Walleye does not meet this stringent pleading standard. The SAC neither adequately pleads that Silver Lake, BC Partners, and McGlade knew about the November 5, 2019, meeting, nor that the fact of the meeting, or any information learned there, constitutes material, non-public information.

### A. Walleye did not adequately plead that Silver Lake knew about the meeting with the FCC.

Walleye's pleadings that implicate Silver Lake do not specifically allege the who, what, when, where, or how that

entity learned of the November 5, 2019, meeting prior to selling Intelsat shares.

The SAC alleges that "Silver Lake was Intelsat's second largest shareholder, owning about 9% of the Company prior to the relevant sales." Walleye also alleges that "Silver Lake . . . [was] entitled to special Board-level information rights from the Company" and to "receive from the Company upon reasonable request any information," including "from time to time," "non-public information about the Company." Finally, the SAC alleges that "Silver Lake . . . obtained the material non-public information from Intelsat and in the context of their roles as insiders of Intelsat . . . and through their information rights afforded by their shareholder and governance agreements." None of the statements from the confidential witnesses contains any information about when or how Silver Lake learned of the meeting.

These barebones pleadings do not meet the stringent pleading standards of the PSLRA because they do not allege what information Silver Lake specifically obtained or "when and from whom" Silver Lake obtained it. *Neubronner*, 6 F.3d at 672. The shareholder agreement referenced by Walleye[11] does not give Silver Lake special information rights to material, non-public information apart from information that Silver Lake requests pursuant to bona fide reporting or other legal obligations. The SAC does not allege either that Silver Lake requested any such information or that Silver Lake would be entitled to it had it made such a request. Thus, even if "must have known" allegations are sufficient, *see Neubronner*, 6 F.3d at 672, Walleye does not

---

[11] Silver Lake argues that the shareholder agreement was appropriately incorporated by reference in the SAC, *In re Silverlake*, 2022 WL 4485815, at *2 n.3, and Walleye does not dispute this.

plead any information which leads to the strong inference that Silver Lake must have known any material non-public information.

Finally, Walleye argues that *Neubronner* does not require plaintiffs to plead "when and from whom" the insider traders obtained information. This argument misreads *Neubronner*, which clearly requires a complaint plead "*times*, *dates*, places, benefits received, *and other details*" and affirms dismissal of a complaint where the plaintiff did "not allege specifically what information [defendant] obtained" or "when and from whom he obtained it." 6 F.3d at 672 (emphasis added).

## B. Walleye did not adequately plead that BC Partners knew about the November 5, 2019, meeting prior to its trade.

As the district court held, Walleye did not allege with particularity any communications between Intelsat and BC Partners on November 5. Confidential Witness Two merely stated that Intelsat kept the Board apprised of the negotiations with the FCC through regular board meetings. But neither Confidential Witness One nor Confidential Witness Two stated that Intelsat called an emergency board meeting immediately following the November 5 meeting. Instead, as the district court noted, they simply asserted that the "Board was likely kept in the loop," and that it was "obvious" the Board was updated.

The other allegations in the SAC are equally vague and speculative: "[Confidential Witness Two] said that he thinks the update *would have* become even more frequent as the negotiations progressed" and, "[a]ccordingly, it *makes sense* that Intelsat's board members were quickly made aware of the disastrous November 5th FCC meeting." Although

Walleye claims that the "bankruptcy filings further confirm the frequent informal communications between Intelsat's senior insiders," it identified no communications on November 5 with BC Partners about the November 5 FCC meeting.

The confidential witness statements do not allege the specific information required under Rule 9(b) and the PSLRA, including who informed BC Partners or how they were informed. *See Neubronner*, 6 F.3d at 672. Instead, the confidential witness statements are to the contrary, stating that the regular course of action would have been to update BC Partners at the following board meeting. Even had the confidential witnesses stated that someone specifically told BC Partners, or its director-representatives, about the November 5 FCC meeting, they have no personal knowledge of such "facts" one way or another, making their statements unreliable. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) ("None of these confidential witness statements establishes the witnesses' personal knowledge or reliability by recounting the particulars of the alleged transgressions."). Spengler's bankruptcy testimony that he neither told nor was aware of anyone else telling the insider shareholders about the meeting underscores this deficiency.

Walleye argues that BC Partners' Board membership strongly suggests that they would have been updated as to particularly important information. The cases it cites, however, are inapposite. In *No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v. American West Holding Corp.*, 320 F.3d 920 (9th Cir. 2003), the operative complaint alleged sufficient facts to show board members had knowledge of ongoing, major operational and maintenance problems, not that board members would necessarily be

updated about a single event the same day it occurred. *Id.* at 943. Of course, it would be incredible to say that Intelsat *never* informed BC Partners of the results of the meeting, but it would be a reasonable alternative explanation to say that BC Partners were informed on a later date. *See id.* at 943 n.21. Similarly, *Berson v. Applied Signal Technologies, Inc.*, 527 F.3d 982 (9th Cir. 2008), is distinct because, there, the court assumed directors knew about operational issues when they were responsible for their company's day-to-day operations. *Id.* at 988. The present case does not involve day-to-day operational issues, or even issues that occurred over a long period of time. That Intelsat would have immediately told BC Partners about the various perspectives of the participants in the meeting over the course of a few hours on a particular day is a much weaker inference than assuming a board member would know about a long-term, on-going operational issue.

### C. Walleye did not adequately plead that McGlade possessed material non-public information.

For similar reasons, Walleye did not adequately plead that Intelsat informed McGlade of any material non-public information. Walleye points to the fact that McGlade often worked from the Intelsat offices but does not allege that he did so on November 5. It also points to its vague allegation that McGlade "stayed heavily involved in the Company," which is not enough to survive the requirements of Rule 9(b) and the PLSRA. *Neubronner*, 6 F.3d at 672. Finally, Walleye argues that "to update McGlade . . . about developments in the C-Band negotiations, Spengler would just jump on a conference call, rather than waiting to prepare more formal communications, and that Spengler would immediately debrief McGlade and others on the 20th floor with updates." This allegation too falls short; Spengler

specifically testified that he did not inform any insider shareholders about the FCC meeting.

### D. Walleye did not adequately plead that the alleged information was material.

Nor has Walleye sufficiently pleaded that any information the traders had was material. An omitted fact is material if there is a "substantial likelihood that a reasonable shareholder would consider it important." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A plaintiff must plead a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly altered* the 'total mix' of information made available." *Id.* (emphasis added).

Walleye frames the November 5 meeting as leading to several independent pieces of material, non-public information. But the existence of the meeting, Degani's body language, and management's speculation about the FCC position do not "significantly alter" the total mix of information available to the public at the time.

First, the fact of the FCC meeting is not material, non-public information. Given the fact that Intelsat and other interested parties held 50 or more other meetings with the FCC over a two-year period, nothing in the SAC indicates that the fact of the meeting itself would have altered the mix of already available information. *See McCormick*, 26 F.3d at 879 (involvement of investment bankers was not material where it only confirmed an ongoing search for a prospective buyer); *id.* at 881 (fact of meeting with tax expert to discuss potential tax consequences of a potential transaction was not material where public was otherwise informed of a potential transaction).

Second, Walleye contends that, despite sworn testimony of the attendees at the meeting, we should rely on statements from confidential witnesses not present at the November 5 meeting to conclude that the FCC disclosed its plans to announce a public auction.  We decline to do so.  None of the confidential witnesses has personal knowledge of what occurred.  *See Zucco Partners, LLC*, 552 F.3d at 997–98. Their triple hearsay, which does not contain a recounting of what the FCC said in the meeting, is not reliable under our precedent.  *Id.* at 997 ("This triple hearsay . . . is not detailed enough to pass muster.").

Finally, and in contrast, the SAC outlines the testimony of SES CEO Collar, who testified that the attendees of the meeting "all formed slightly different impressions" about Degani's position, who was "very quiet" and "responded only to a handful of questions."  Indeed, Collar continued that Degani said "something which was hard to interpret" and "*one* interpretation of what he said was that . . . we were running into political objection."  Spengler testified that the attendees "didn't know" whether "the tide seemed to be turning" after the meeting, that Degani was tight-lipped at the meeting, and that he didn't respond to questions.  None of this testimony indicates that the FCC disclosed its plan to reject a private auction.[12]   Moreover, any conclusion by the attendees based on Degani's body language was merely speculation.  *See SEC v. Truong*, 98 F. Supp. 2d 1086, 1098 (N.D. Cal. 2000) ("Courts stress that the SEC may not base insider trading actions on strained inferences and speculation.").  The SAC thus does not adequately allege

---

[12] *See In re Silverlake*, 2022 WL 4485815, at \*3 (taking judicial notice of a variety of public documents suggesting that the political tides were turning against a private auction).

that the fact of, contents of, or impressions surrounding the FCC meeting constituted material non-public information.

## CONCLUSION

The judgment of the district court is **AFFIRMED.**